AMERICAN TOBACCO COMPANY, R. J. Reynolds Tobacco Company, and Liggett & Myers Tobacco Company, Libelants,

v.

Basil GOULANDRIS, Nicholas Goulandris, and Leonidas Goulandris, doing business as "Goulandris Brothers" and General Steam Navigation Company, Ltd. of Greece, Respondents.

BANK OF GREECE, Lekas & Drivas, Inc., Pompeian Olive Oil Corporation, and Victor Cory Company, Libelants,

v.

Basil GOULANDRIS, Nicholas Goulandris, and Leonidas Goulandris, doing business as "Goulandris Brothers" and General Steam Navigation Company, Ltd. of Greece, Respondents.

Basil GOULANDRIS et al., Cross-Libelants,

v.

R. J. REYNOLDS TOBACCO COMPANY and Liggett & Myers Tobacco Company, Cross-Respondents.

Basil GOULANDRIS et al., Cross-Libelants,

v.

BANK OF GREECE, Lekas & Drivas, Inc., Pompeian Olive Oil Corporation, and Victor Cory Company, Cross-Respondents.

United States District Court
S. D. New York.
April 9, 1959.

See also D.C., 134 F.Supp. 475.

Bigham, Englar, Jones & Houston, New York City, for libelants and cross-respondents, John W. R. Zisgen, Owen C. Torrey, Jr., New York City, of counsel.

Kirlin, Campbell & Keating, New York City, for respondent, General Steam Navigation Co. Ltd., of Greece, L. de

Grove Potter, Michael F. Whalen, Alfred J. Skidmore, New York City, of counsel.

Hill, Betts & Nash, New York City, for respondents and cross-libelants, Goulandris, James E. Freehill, Herbert D. Schedler, Francis P. Kelly, New York City, of counsel.

RYAN, District Judge.

These suits in Admiralty were filed as early as May, 1941; they come before us consolidated for trial in March, 1958. This opinion has been written after reviewing over 20,000 pages of depositions, "condensed" by the proctors into an agreed digest of more than 2,000 pages; truly, the machinery of the law grinds slowly in our human attempts to accomplish justice.

The suits arise out of admitted and undisputed damage to cargo which was carried on the Steamship Ioannis P. Goulandris from Turkish and Greek ports, via the Suez Canal and the Cape of Good Hope, to Norfolk, Newport News and New York on a passage which began in October, 1940 and ended in May, 1941. Much of the factual background and some of the legal problems presented by the suits are similar to those dealt with in prior litigation conducted in this District Court in American Tobacco Co. v. The Katingo, Hadjipatera, D.C., 81 F.Supp. 438, modified and affirmed, 2 Cir., 194 F.2d 449 (certiorari denied, American Tobacco Co. v. Hadjipateras, 343 U.S. 978, 72 S.Ct. 1076, 96 L.Ed. 1370).

The first suit was filed by the American Tobacco Company for damage to four shipments totaling 9,302 bales of tobacco shipped at Izmir, Turkey and consigned to Newport News; by R. J. Reynolds Tobacco Company for damage to five shipments, totaling 18,397 bales of tobacco, 3,600 being shipped at Izmir, the remainder at Cavalla and Salonica, and all consigned to Newport News; and by Liggett & Myers Tobacco Company for damage to one shipment of 5,000 bales of tobacco, shipped at Izmir and consigned to New York. The damages sustained by the shipments involved in this suit are alleged to approximate $1,000,000.

The second suit was filed by Bank of Greece for damage to four shipments, totaling 7,350 bales of tobacco, 4,284 of which were shipped at Salonica, 1,956 at Piraeus, and all consigned to New York; by Lekas & Drivas, Inc. for damage to 315 packages of cheese shipped at Salonica and consigned to New York; by Pompeian Olive Oil Corporation for short delivery of and damage to a shipment of 315 drums of olive oil shipped at Izmir and consigned to New York; and by Victor Cory Company for damage to 500 drums of olive oil shipped at Izmir and consigned to New York. (As against General Steam Navigation Co. Ltd. of Greece, the Cory claim has been dismissed). The damages sustained by the shipments involved in this suit are alleged to exceed $150,000.

The third suit, a cross-libel was filed by the owners of the vessel against R. J. Reynolds Tobacco Company and Liggett & Myers Tobacco Company for contribution in general average to sacrifices of the vessel owners, alleged to have been made during the voyage.

The fourth suit, a cross-libel, was filed by the vessel owners against Bank of Greece and the other libelants in the second suit for the same purpose. The contributions claimed in the third and fourth suits total $184,213.36.

Each libelant had the individual or corporate status ascribed to it in the libels.

Libelants, except Pompeian Olive Oil Corporation and R. J. Reynolds Tobacco Co., were owners at the time of the loss and damage of the shipments with respect to which they have filed suit and are entitled to sue thereon.

Libelant R. J. Reynolds Co. was the party beneficially interested in, and we have found was entitled to sue for the damage for which it claims in the libel.

Proof of the right of libelant, Pompeian Olive Oil Corporation, to sue for damage to the shipments for which it

makes claim has been expressly reserved by stipulation for future determination.

Respondents, Basil, Leonidas and Nicholas Goulandris, were brothers, residents of Greece and, at the times relevant, each owned a 30% interest, respectively, in the S.S. Ioannis P. Goulandris. A 10% interest in various shares in the vessel was owned by a number of other persons not parties to the cargo damage suits.

Goulandris Brothers (Hellas) Ltd. is a corporation organized and existing under the laws of the Kingdom of Greece which acted as agents and managers in Greece for vessels owned by the three Goulandris brothers and other persons. The firm of Goulandris Brothers (Hellas) Ltd. managed the vessel on the voyage in suit on behalf of and with the authority of the owners.

Respondent, General Steam Navigation Co. Ltd. of Greece (hereinafter referred to as "Greek Line") is a corporation organized and incorporated in Piraeus in July 1939. "Greek Line" acted as agent for the owners of the vessel for the collection of freight in connection with this voyage.

The S.S. Ioannis P. Goulandris was a 3 island type vessel, having a raised forecastle and poop and a bridge housing amidships. The vessel was a single screw coal-burning cargo vessel of 2,223 net registered tons and 3,750 gross tons, built in 1910 at Stockton, England. She was equipped with Scotch boilers and a triple expansion engine. She was 362 feet long with a beam of 51 feet and a molded depth of 26½ feet, and had a speed of 8 knots, fully loaded, under normal conditions with good weather and good coal.

The vessel was classified 100A1 by Lloyd's in February, 1940.

The vessel had 5 holds, Nos. 1 and 2 and the crossbunker forward of the engine room, and Nos. 3 and 4 aft of the engine room. A 'tweendeck space over the No. 2 hold extended partly over the No. 1 hold and a 'tweendeck space over the No. 3 hold extended partly over the No. 4 hold.

The No. 1 hold was 58 feet long with an after beam of 51 feet, a forward beam of 18 feet 4 inches and a mean depth of 23 feet, 6 inches. The No. 2 'tweendeck extended forward 13 feet 4 inches over the after part of the No. 1 hold.

The No. 2 hold was 76 feet, 6 inches long with a mean beam of 51 feet and a mean depth of 20 feet 6 inches. The No. 2 'tweendeck began 13 feet 4 inches forward of the forward bulkhead of the No. 2 lower hold and extended aft to the wooden thwartship partition consisting of 3-inch thick planking, caulked with cotton and covered with glued paper which divided the after 'tweendeck and main deck hatches in half.

The No. 3 hold was 60 feet long with a mean beam of 51 feet and a mean depth of 20 feet 3 inches. The No. 3 'tweendeck began at the forward bulkhead dividing it from the engine space and extended aft to approximately 14 feet aft of the thwartship bulkhead separating the No. 3 from the No. 4 hold.

The No. 2 and No. 3 'tweendecks were approximately 40 feet wide and 8 feet high.

The No. 4 hold was 59 feet 6 inches long with a forward beam of 49 feet 6 inches, a mean beam of 27 feet and a mean depth of approximately 20 feet. The No. 3 'tweendeck extended over the forward part approximately 14 feet.

The poop was a small compartment with a cubic capacity of 6,222 feet, a height of 10 feet and with a large hatch 14 feet by 11 feet 11 inches.

Each hold had a centerline, removable, wooden bulkhead running fore and aft but not across the square of the hatch. The centerline bulkheads divided the holds into port and starboard halves except for the hatch square. The centerline bulkheads were constructed of 10-inch boards, 2½ inches thick, running fore and aft with spaces between the boards of ¼ to 1 inch. The bulkheads extended in the Nos. 1 and 2 holds from

the tank tops to points varying from 1 foot to 3 inches from the undersides of the overhead deck beams. In the No. 3 hold the bottom of the centerline bulkheads rested on top of the shaft tunnel and the section of the bulkhead aft of the hatchway was about 6 feet long with the top about 6 feet from the overhead deck beams because there were no boards in this part. Many of the boards of the centerline bulkheads were broken and chipped, leaving open spaces in the bulkheads.

The Nos. 2 and 3 'tweendecks had centerline, removable, wooden bulkheads constructed like those in the holds running fore and aft, but not across the hatch squares, which divided the 'tweendecks into port and starboard halves. The bulkheads touched the overhead deck beams at some points and at others were separated by at least a foot.

The depth of the vessel's frames in all cargo compartments was 10 inches, to which were attached 1-inch temporary, wooden, cargo battens about 1 foot apart, fastened by means of cleats on the frames. All cargo was thus at least 1 foot from the vessel's skin or shell plates.

There were no permanent wooden ceilings over the double bottom tanks except in the square of the hatch in No. 2 hold. The bottoms of Nos. 1, 2 and 3 holds, except as stated above, were covered with crisscross dunnage of a total thickness of 3 inches.

No. 1 hold had vertical stiffeners on the after bulkhead and the No. 3 hold had vertical stiffeners on the forward bulkhead extending 13½ inches into the hold and spaced 28 inches apart. No. 1 also had a horizontal beam at the center of the No. 1 after bulkhead extending 16 inches into the hold. There were no bulkhead stiffeners in No. 2 hold. Under the corner of each hatch in Nos. 1, 2 and 3 holds were "I" beams, 10 inches by 8 inches, supporting the 'tweendeck.

A steel shaft tunnel about 8 feet 3 inches high ran through No. 3 and No. 4 holds without any steam pipes in the tunnel.

Hatch No. 1 was 30 feet 4 inches long and 18 feet wide. No. 2 forward hatch was 28 feet long and 22 feet wide. No. 2 after hatch was 13½ feet long and 20 feet wide, with two trimming hatches 22 x 30 inches in the corners of the 'tweendeck leading to the lower hold. Hatch No. 3 was 32 feet 6 inches long and 22 feet wide, with four trimming hatches 22 x 30 inches in the 'tweendeck leading to the lower hold; one in the forward, starboard corner 11 feet aft of the forward, thwartship bulkhead and 9 feet 6 inches from the skin of the vessel; another in the forward, port corner 6 feet 6 inches aft of the forward, thwartship bulkhead and 4 feet 9 inches from the skin of the vessel; another in the after, starboard corner about 8 feet forward of the thwartship bulkhead and 8 feet 10 inches from the skin of the vessel; and the fourth in the after, port corner about 8 feet forward of the thwartship bulkhead and 9 feet 6 inches from the skin of the vessel. Hatch No. 4 was 30 feet 4 inches long and 18 feet wide.

No. 1 hold and 'tweendeck had four ventilators; two forward on port and starboard, 20 inches in diameter and extending 7 feet 3 inches above the weather deck to a 36-inch cowl, 12 feet 4 inches from the skin of the vessel and 5 feet from the forward bulkhead; two aft ventilators 20 inches in diameter, one on starboard side extending 8 feet 5 inches above the weather deck with a 35-inch cowl and a 14-inch telescopic tube extending into the lower hold with a 3-inch annular opening into the 'tweendeck; another on port side extending 8 feet 9 inches above the weather deck with a 35-inch cowl, each 5 feet 5 inches from the skin of the vessel and 17 feet 4 inches from the centerline bulkhead and 2 feet from the after bulkhead.

No. 2 hold and 'tweendeck had two forward telescopic ventilators 20 inches in diameter, one on the starboard side extending 8 feet 7 inches above the weather deck to a 35-inch cowl; the other on the port side extending 8 feet 11 inches to a 33-inch cowl and telescoped through the 'tweendeck with a 3-inch annular

opening into the 'tweendeck, each against the forward bulkhead and 14 feet from the skin of the vessel.

No. 3 hold and 'tweendeck had four ventilators, two on either side, forward and aft, 20 inches in diameter. The forward starboard ventilator extended 8 feet 1 inch above the weather deck to a 33-inch cowl with a 14-inch telescopic tube extending into the lower hold with a 3-inch annular opening into the 'tweendeck. The forward port ventilator extended 8 feet 5 inches above the weather deck to a 36-inch cowl, 11 feet from the skin of the vessel and 3 feet from the forward bulkhead with a 14-inch telescopic tube extending into the lower hold with a 3-inch annular opening into the 'tweendeck. The after starboard ventilator extended 8 feet 5 inches above the weather deck to a 34-inch cowl and to the lower hold by a telescopic 14-inch tube with a 3-inch annular opening into the 'tweendeck and 5 feet 10 inches from the skin of the vessel and 2 feet 5 inches from the after deck bulkhead. The after port ventilator extended 8 feet 9 inches above the weather deck to a 33-inch cowl 16 feet 8 inches from the centerline, 6 feet 8 inches from the skin of the vessel and against the after bulkhead and not telescoped.

No. 4 hold had four ventilators; two at the forward end, the port had a 14-inch trunk and the starboard had a 20-inch trunk, and two at the after end, port and starboard, of the hold leading from samson posts on the poop, which ventilators had 14-inch trunks and were equipped with large cowls.

All ventilator cowls were well above decks and accessible to a free flow of air, and were not impeded by any obstruction, except for the aft ventilators of No. 4 hold the upper ends of which had been closed. The poop had no permanent ventilators.

The hatchboards for the after three-quarters of the square of the No. 2 forward 'tweendeck hatch and all of the hatchboards for the No. 2 after 'tweendeck hatch were removed at the inception

of the voyage and remained off throughout the voyage.

The vessel's ventilating facilities in Nos. 1, 2 and 3 holds and Nos. 2 and 3 'tweendecks were adequate for the carriage of tobacco from Greek and Turkish ports to the United States via Gibraltar in the fall of the year. The Nos. 1, 2 and 3 holds and the Nos. 2 and 3 'tweendecks were in all respects proper places for the stowage and carriage of the tobacco.

The ventilating facilities in No. 4 hold and of the poop were not adequate for the carriage of the cheese stowed in it for a voyage from Greek ports to the United States via Gibraltar in the fall of the year, stowed as it was at port of loading.

The cargo spaces were equipped with temporary wooden cargo battens 1 inch thick at the sides of the vessel about 1 foot apart in horizontal fore and aft positions with vertical dunnage overlaid and all over-hung with loosely-woven, straw mats. All thwartship bulkheads in compartments where tobacco was stowed were dunnaged and hung with loosely-woven, straw mats.

There was no permanent wooden ceiling over the double bottom tanks in any hold where tobacco was stowed with the exception of the square of the hatch in No. 2 hold. The remaining area in No. 2 hold and the entire bottom of No. 1 and No. 3 holds where tobacco was stowed on the bottom over the double bottom tanks was covered with crisscross dunnage 3 inches in thickness over which was laid clean, dry, loosely-woven straw mats.

There were loosely-woven straw mats between the tobacco and the fore and aft centerline bulkheads. Loosely-woven straw mats were placed on the 'tweendeck hatchboards in No. 3 'tweendeck and on the forward part of No. 2 'tweendeck hatchboards before the tobacco was stowed there.

All trimming hatches were 22 x 30 inches and covered by dunnage boards 1 inch thick, about 4 inches wide and separated by about 4 inches with a single

layer of loosely-woven straw mats laid over them. Tobacco was stowed over the straw mats over the trimming hatches in No. 3 'tweendeck and in the forward part of No. 2 'tweendeck.

There was no permanent sheathing around the shaft tunnel. Prior to loading of cargo, the shaft tunnel was covered with wooden dunnage upon which was laid one or more layers of loosely-woven straw mats with small openings through their surfaces.

All holds and 'tweendecks were swept and cleaned between Spalato and Izmir, Turkey, where loading and stowage of tobacco commenced on October 16, 1940. All bilges were dry before loading commenced.

The block system of stowage was used for bales of tobacco throughout holds Nos. 1, 2 and 3 and in Nos. 2 and 3 'tweendecks. All bales were loosely-stowed with about 1 inch between the rows of bales. There were spaces all around the bales and at the stanchions. The bales were stowed about one foot from the sides of the vessel and with about one-foot spaces between the dunnaged and matted forward and after bulkheads except where the hold was divided by the centerline bulkhead.

At the bottom of No. 1 lower hold 3,600 bales of tobacco were loaded at Izmir; immediately above that lot, 8,837 bales of tobacco were loaded at Cavalla; and above that lot, two shipments of 2,550 and 2,280 bales of tobacco were loaded at Salonika. All of the said four shipments were made by Glenn Tobacco Company. At Salonika 1,401 bales of tobacco of a 1,425 bale shipment of tobacco, made by A. Michaelides (Tobacco Company) S.A. were loaded in No. 1 hold; 24 bales of this lot were stowed in the No. 2 'tweendeck. There was an empty space of about 1½ feet between the top of the stow and the overhead deck beams. Forward and aft, the stow of tobacco in No. 1 hold extended from the ship's side battens on each side to the center line bulkheads; and in the way of the hatch opening the stow extended from the battens on one side to those on the other.

Vertically, the stow extended from the dunnage over the tank tops to within about 1½ feet of the overhead deck beams, a distance of 20 or 21 feet aft and 24 or 25 feet forward. There were no rice ventilators in the stow and no athwartships trench.

At Izmir, 850 steel drums of olive oil were loaded at the bottom of No. 2 hold upon the dunnaged ceiling. The drums were stored fore and aft on their sides, 3 tiers high except in the after third of the hold where they were stowed 1 tier high. The drums rested on a wooden platform of 2 layers of 1-inch boards spaced 4 to 5 inches apart, running thwartships and fore and aft over which were laid straw mats.

There were also loaded at Izmir in No. 2 hold 2,524 bales of tobacco of Shalom Brothers in the forward third of the hold over the drums of olive oil. Over that lot were loaded at Izmir two lots of 172 and 356 bales respectively. Over those lots were loaded at Salonica 2,064 bales of tobacco of Herman Spierer. The stow of the bales in this forward part came to within 1 foot of the overhead deck beams.

Aft of the forward lots and occupying the center third of No. 2 hold there were stowed at Piraeus over the drums 5 lots of baled tobacco and over those 5 lots were stowed at Piraeus 1,956 bales of tobacco of Papastratos Brothers. The top of this stow was about 10 feet from the overhead 'tweendeck beams.

At the after end of No. 2 hold over the single tier of drums were stowed at Salonica 1 lot of 600 bales of tobacco of A. Camaras & Company and over this lot were stowed at Salonica 3,524 bales of a lot of 3,684 bales of tobacco of Papastratos Brothers. The top of this stow was about 11 feet below the overhead 'tweendeck beams except for the top of the stow directly under the after hatch square where there was empty space right up to the underside of the main-deck hatchboards. On top of the Papastratos lot were stowed the 24 bales of the 1,425-bale Michaelides lot for which there was no room in No. 1 hold. For-

ward and aft of the hatch opening the tobacco in the No. 2 lower hold was stowed from the battens on each side of the ship to the center line bulkhead. In the way of the hatch opening it extended from the battens on one side of the ship to those on the other. There were no rice ventilators in the stow, and there was no athwartships trench.

In No. 2 'tweendeck there were loaded at Izmir 2,072 bales of tobacco of Gary Tobacco Company, stowed all around the 'tweendeck and on the forward quarter of the forward hatch square. No bales were stowed on the after three-quarters of the forward hatch square and none were stowed on the after hatch square.

No cargo was stowed in the lower cross-bunker.

In No. 3 hold were first loaded at Izmir 4,614 bales of tobacco of the Yerli Urunler, S.A., shipped to American Tobacco Company at Newport News. Next loaded were two shipments of 291 bales and 138 bales of Yerli Urunler, S.A. for American Tobacco Company at Newport News. Over these lots were loaded 4,159 bales of American Tobacco Company of the Orient, Inc. The stow extended up to within 1 or 2 feet of the overhead deck beams, some 19 feet or more.

Fore and aft of the hatch opening, the stow in No. 3 lower hold extended from the side battens on either side to the center line bulkhead, and in the way of the hatch opening it extended from the battens on one side to those on the other. There were no rice ventilators in the stow, and there were no thwartships trench.

In the No. 3 'tweendeck there were loaded at Izmir 100 bales of tobacco of Yerli Urunler, S.A., stowed on the starboard side, aft, and 2,928 bales of tobacco of Gary Tobacco Company stowed in the after half of the compartment.

There were loaded forward of these two lots in No. 3 'tweendeck at Cavalla 1,110 bales of tobacco of Pialoglou Freres

and there were loaded at Salonica 160 bales of tobacco of Papastratos Brothers stowed over the 1,110 bales of Pialoglou Freres. The bales were stowed all around the 'tweendeck and on the hatch square but in the place of the regular hatchboards, there were set wooden planks laid on top of the beams and those planks were separated by spaces varying from 4 to 6 inches and were overlaid with loosely-woven straw mats. The stow extended up to within ½ foot of the overhead deck beams.

In the after part of No. 4 hold were loaded 67 cases and 7 barrels of cheese of Lekas & Drivas.

In the poop were stowed 10 lots of cheese consisting of 945 cases altogether, 241 cases of which were the property of Lekas & Drivas, Inc. The poop was filled from forward to aft, from side to side and from top to bottom with the cheese.

The drums of olive oil shipped by Pompeian Olive Oil Corp. were stowed in the usual and customary manner in No. 2 lower hold.

All shipments were booked with the expectation that the vessel would proceed to the United States via Gibraltar. The block stowage system used in Nos. 1, 2 and 3 holds and Nos. 2 and 3 'tweendecks with respect to bales of tobacco was a customary and proper method of stowage for a voyage from the ports of loading to the United States by way of Gibraltar.

In all cargo compartments, dunnage and matting were employed in the customary and proper manner to protect the cargo. Dunnage and matting were employed against the battens on the ship's sides and against the fore and aft bulkheads in all compartments in a proper manner to protect the cargo from sweat. The use of maps on the longitudinal center line bulkheads fore and aft of the hatch openings was proper. The use of matting over the trimming hatches, over the forward quarter of No. 2 'tweendeck hatch, and over the entire No. 3 'tweendeck hatch was also proper.

At each loading port prior to the outbreak of war, representatives of the tobacco shippers, excepting A. Camaras & Company, inspected the vessel's stowage compartments respecting suitablity, cleanliness, dunnaging and matting. They did not disapprove of the stowage or make any suggestions, or issue any special instructions with respect to the stowage of the tobacco.

All the vessel's officers were properly licensed and competent. The master Polemis (who left the vessel at Piraeus) personally had experience in carrying tobacco from Egypt to North European, Continental ports; the other officers had had experience in the stowage and care of perishable cargoes such as rice and grain which are susceptible of self-heating if they contain excess moisture. The ship's officers did also receive suggestions from the tobacco shippers at the ports of loading respecting the care of the tobacco during the voyage.

The tobacco in the 3,684 bale shipment made by Papastratos Bros. from Salonica (3,524 of which were stowed in the No. 2 lower hold and the remaining 160 in the No. 3 'tweendeck) was of the 1938 crop. 700 bales of the 1956 bale shipment made by Papastratos Bros. from Piraeus, stowed in the No. 2 lower hold, were of the 1936 crop. All of the other tobacco involved in the litigation was of the 1939 crop. All tobacco had been purchased from Turkish and Greek planters between January and May, 1940.

The tobacco had been grown on hundreds of small farms; it had different characteristics such as leaf texture, burning rate and moisture content because of differences in the soil, rainfall and temperature of the locations where grown.

The tobacco had been picked when green, exposed to the sun to dry for about 2 weeks and then hung in sheds until it had suitable moisture for baling as determined by each farmer; after baling, the farmers' bales remained with the farmers until transported to the buyers' warehouses between January and May, 1940. The bales were stored thereafter in the buyers' warehouses for several weeks 2, 3 or 4 tiers high until manipulation commenced; the farmers' bales were then broken down and the tobacco leaves separated according to size, color and quality and then picked into new bales. Manipulation occurred between the middle of February and September, 1940, and after baling, the bales had been covered on 3 sides with hessian cloth and pressed into shape and then stored in warehouses awaiting shipment.

There were three types of bales; (1) basma bale measuring about 29″ x 12″ x 5″ and weighing 39 lbs., consisting of the more carefully packed tobaccos; (2) the Macedonian tonga bale measuring about 22″ x 19″ x 10″ and weighing 50 to 52 lbs.; and (3) the Izmir tonga bale measuring about 26″ x 19″ x 15″ and weighing 120 lbs.

Fermentation commenced in May and June, 1940, with the advent of warm weather and lasted from 2 weeks to 1 month. During fermentation, the tobacco self-heated, and to prevent it from overheating, molding and rotting, the bales were kept loosened so air could circulate through the leaves, and each bale was separated from the other. The position of the bale was changed regularly to throw off the heat so generated and to gradually reduce the moisture content.

The factors creating fermentation are moisture, temperature, time and the nature and condition of the tobacco, and since the character of the tobacco varied, the fermentation process was not always uniform. Some bales heated to a greater extent than other bales during the fermentation process and therefore required special attention such as loosening of the lacing and the wrapping for aeration, and in some instances the bales had to be set aside and more carefully watched.

Excessive moisture content in Turkish or oriental leaf tobacco is a significant causal factor in the self-heating of such tobacco when baled. No convincing proof was adduced of the moisture content of the tobacco shipments here involved.

The process which culminates in spontaneous ignition of tobacco consists of two phases. The first phase is a bacteriological or enzymatic process, of long duration, during which heat is evolved slowly; and if the heated tobacco is confined to such a degree that the rate of generation of the heat exceeds the rate of its dissipation, the temperature within the bulk rises. The temperature achieved by this process does not exceed the range of 130 to 150° F. The second phase is a process of chemical decomposition, of much shorter duration, during which the temperature rises rapidly; and if the heat is confined, this results ultimately in ignition if sufficient oxygen is present to permit that, or in reduction of the tobacco to a charcoal-like mass if there is insufficient oxygen present to permit actual ignition.

During the first phase, tobacco sustains no damage, unless its subjection to the highest attained temperatures continues for a long period of time. The ignition temperature of tobacco is in excess of 350° F. Tobacco becomes of no commercial value for smoking purposes when subjected to temperatures exceeding 260° F. but below 350° F.

The methods of manipulation, storage, preparation for shipment and examination before shipment employed by the shippers of tobacco on the vessel were safe and proper for the transportation of the tobacco on the originally contemplated voyage from ports of shipment to the United States via Gibraltar if the tobacco was properly and carefully stowed and cared for during the voyage.

The methods of manipulation, storage, preparation for shipment and examination before shipment employed by the shippers of tobacco on the vessel were not safe and proper for the transportation of the tobacco on the voyage actually made from ports of shipment to the United States via Suez and the Cape of Good Hope even when the tobacco was properly stowed and cared for during the voyage.

The less the height to which tobacco is stowed, the greater the length of time that is required for heat which develops spontaneously to reach a temperature which damages the tobacco. Spontaneous heating of tobacco is progressive and the rate at which it develops increases with the passage of time.

On the voyage in suit the temperature of the stow was not taken by thermometers at any time; no member of the vessel's personnel entered or could enter No. 3 lower hold at any time between the vessel's sailing from Salonica and her arrival at Aden, nor between her departure from Aden and her arrival at Barbados.

None of the vessel owners or any person of authority connected with them, other than the master, had personal knowledge of the details of the stow.

The vessel owners took no personal part in the stowage, had no knowledge of the details of the stow and had no reason to know or be familiar with the stowage.

On October 26, 1940, the vessel arrived at Piraeus, Greece, having on board the shipments described above laden at Izmir, Cavalla and Salonica, stowed as hereinbefore described. She was expected to sail within a few days via Gibraltar to Newport News, Norfolk and New York.

On October 28, 1940, Italy attacked Greece, and the vessel was requisitioned by the Greek Government, and proceeded under Greek Government orders on a military mission to the Corinth Canal, from which she returned to Piraeus on November 8, 1940. She was released from requisition at 9:00 a. m. on that date. Thereafter and before she was again requisitioned sometime on November 9th 1940 she loaded upon instructions of the Greek Government the balance of her Piraeus cargo, which was put in No. 2 hold.

The advent of war between Italy and Greece prevented the accomplishment of the expected voyage via Gibraltar by the S.S. Ioannis P. Goulandris, a vessel of Greek registry. It was obvious that if the voyage were made at all it would

have to be made by way of Suez and the Cape of Good Hope.

Subsequent to requests of the American Tobacco Company, Glenn Tobacco Co., Inc. and Papastros Brothers, the Greek Government on or about November 9, 1940, again issued orders to requisition the vessel to complete her voyage to the United States via Suez, and on Sunday morning, November 10th, 1940, owners' clerk, Firios, was called to the office of the Director of State Maritime Transports where he and the general manager of the operator of the S.S. Katingo were told that unless the owners of the vessel agreed to arbitrate the extra freights to be paid by libelants to complete the voyage via Suez, the vessel, as well as the S.S. Katingo, would be continued under requisition and ordered to proceed via said route.

Firios informed the government official, in the presence of representatives of some of the libelants, that he was without authority to consent to an alteration of the vessel's route or to bind her owners by an agreement to arbitrate the additional freights to be paid, that the owners were not then in Greece, and that he wanted an opportunity to consult with them. Despite his protest and a refusal to allow him time to communicate with the owners, Firios did sign a document embodying a proposed consent to arbitrate contingent upon the vessels not being ordered to sail until (1) the additional freights fixed were paid by the shippers demanding arbitration, and (2) an opportunity was given to communicate with the other shippers. The government official refused to accede to these conditions and appointed a committee to arbitrate. Within a few hours thereafter, before the arbitration was held or any of the conditions met, the Greek Government ordered the vessel to sail from Piraeus in convoy to Port Said and instructed the Master to follow the orders of the British Admiralty throughout the voyage.

Thereafter the Greek-Government-appointed Committee in view of the greater length of the Suez voyage, the resultant increase in expense, the more difficult weather conditions which would be encountered, the increased likelihood of delays on the voyage on account of weather, war conditions, additional coaling stops, waiting for the formation of convoys and delays in convoy, and the interests of respective parties, awarded extra freight amounting to 88% of the original freight. Respondents and the three shippers who were represented at the arbitration hearing (the American Tobacco Company of the Orient, Inc., Glenn Tobacco Co., Inc. and Papastratos Freres) had agreed in advance to accept the award of the arbitrators. The extra freight was paid and accepted.

Thereafter, and throughout the voyage, the owners had no control over the vessel and were unable to communicate directly with her Master because the vessel was sailing under confidential orders and in convoy.

On October 28, 1940 a few hours after the Greek-Italian war broke out, Basil and Leonidas Goulandris had conferred in Athens and decided to cable Goulandris Brothers, London, Ltd. to look after the interests of Goulandris Brothers according to their best judgment in the event that communications were interrupted. They telephoned to Firios at Piraeus, and instructed him to dispatch the necessary cables. After November 10, 1940, it became impossible to communicate from Piraeus directly with ships at sea or in foreign ports, and Goulandris, London, Ltd. received and transmitted all such communications. The Master of the vessel reported to Goulandris, London, Ltd. from Port Said, Suez, Aden, Durban and Barbados, and received communications from Goulandris, London, Ltd. at those ports.

Throughout the voyage from Piraeus the vessel was obliged to follow the orders of the Greek and of the British Admiralty as to her courses, ports of call and military protective measures. Both at Aden and at Barbados, Goulandris, London, Ltd. instructed the Master to be guided by the recommendations of Lloyd's agents.

The intervention of war and governmental orders made it impossible to discharge the cargo at Piraeus or to restow it or to have it returned to the various ports at which it had been loaded.

The vessel sailed from Piraeus on November 10, 1940 and arrived at Port Said in convoy on November 15, 1940, where she was required to wait for government orders until December 1, 1940; she had condenser leakage en route. During this waiting period at Port Said a shipyard made some repairs to the condenser which was put under a hydrostatic test and found tight and free of leakage.

On December 1, 1940, the vessel proceeded through the Suez Canal and anchored in Great Bitter Lake where she joined a convoy. Upon leaving Great Bitter Lake on December 4, 1940 the water was observed to be muddy in the vicinity where the propeller was working.

The vessel proceeded in convoy from Great Bitter Lake through the southern end of the Suez Canal, down the Red Sea until December 11, 1940, when because of strong head winds, moderately rough seas and poor quality of coal which was on board when she commenced loading at Izmir, she was unable to maintain the convoy speed of 8 knots although the engineer increased his engine revolutions from 58 to 62, which was above normal.

On December 12, 1940, it was observed that an excessive amount of water, along with shreds of packing, was passing through the stern gland into the shaft tunnel and that the tailshaft had begun to vibrate. A few hours later, the temperature of the tunnel or line bearing began to rise and the wooden wedges under that bearing slackened. The nuts controlling the flow of water had been tightened up without result.

On December 13, 1940, so much water entered the after well through the stern gland it could not be controlled, and the Master, fearing that the vessel might sink, turned the vessel toward Aden where she arrived on December 14, 1940, and anchored in the roadstead. This was after the chief engineer had found and reported to the Master that it would be necessary to enter port for repairs to the tailshaft assembly.

Aden was a British Naval Base and all its shipyard facilities and marine supplies were under control of the British Admiralty which gave top priority to its vessels over private cargo vessels; no drydock large enough to take the vessel was available.

To draw the tailshaft for inspection while afloat, it was necessary to tip the vessel down by the head by discharging the cargo from the No. 4 hold and poop, from the No. 3 'tweendeck and about 65% of the tobacco from the after end of No. 3 hold, and to put coal on the forepeak weather deck; said cargo was discharged between December 19 and 24, 1940, into lighters and covered with tarpaulins.

When the tailshaft was drawn at Aden, it and the related parts were inspected by a Lloyd's surveyor. His findings, including the work done, were as follows:

(a) The *lignum vitae* staves of the stern tube were scored circumferentially over the whole surface with greater wear evident on the staves of the top half of the *lignum vitae* bearing. The top half of the *lignum vitae* staves were badly worn and the surveyor recommended that the worn *lignum vitae* be renewed, which was done before completion of the repairs and reassembly of the tailshaft.

(b) There was some chipping at the fore and after ends of the *lignum vitae* staves, which in the opinion of Lloyd's Aden surveyor occurred from rough handling in drawing the shaft.

(c) The neck ring and gland ring bushes were worn and required repair. They were rebushed and thereafter fitted in the stuffing box and gland ring.

(d) The packing was shredded and worn and required and was replaced with new packing.

(e) The coupling bolts were all tight and in good condition and were later re-

used after their ends had been dressed up.

(f) All holding-down bolts and wedges of the after tunnel bearing were slack (some to a slight extent and some ¾ of a turn) but in good condition and did not require renewal.

(g) The tailshaft liner was slightly rubbed in way of the stern tube bearing.

(h) The white metal in the after tunnel bearing was in good condition and nothing was done to it except to clean the oilways.

(i) The rudder pins and bushes were in good condition.

(j) There was little or no wear on the bronze liner and nothing was required to be done to it except to dress off the ends and remove tool marks from it.

(k) No change was made in the setting of the wedges under the bearings during the final assembly and checking of the tailshaft.

(l) After the tailshaft was reassembled, the propeller nut was hardened up, pin was fitted and nut cemented up.

(m) Upon completion of the repairs and the tailshaft assembly, the tailshaft rested on the bottom of the *lignum vitae* with a clearance of ⅟₁₆th of an inch on top between the shafting and *lignum vitae*; the neck ring and gland ring did not touch the shafting and had a clearance of ⅟₃₂nds of an inch all around.

(n) The stern gland when first observed by the surveyor appeared to have been set up evenly and as far as possible.

(o) Upon the final assembly, the surveyor verified the alignment of the tailshaft by means of feelers at the couplings.

The greater wear on the *lignum vitae* staves in the upper half of the stern bearing, and the worn condition of the neck bush, indicated that the cause of the tailshaft trouble had been a misalignment. As the clearance between the tailshaft and the stern tube when installed was only ⅟₁₆th of an inch, and the tailshaft is 14 or 15 feet long, a very slight degree of misalignment would cause wear on the *lignum vitae* staves of the stern bush. The period of time which elapses before misalignment evidences itself ordinarily depends on the extent of the misalignment.

The cargo discharged from the after holds at Aden was reloaded between January 14 and January 18, 1941, and the vessel sailed on January 18, 1941 for Mombasa. The vessel had been at Aden for these repairs a total of 35 days. Normally, it would have taken about 3 days to drydock a vessel and draw and repair her tailshaft, but because of war conditions there was a lack of drydock facilities at Aden for this, a commercial vessel.

All the cargo was restowed in the same compartments from which it had been discharged, except 36 bales from No. 3 lower hold which were stowed in No. 2 'tweendeck. The cargo when reloaded at Aden was dry and in good condition, except the cheese which had commenced to spoil, had melted and was leaking from the boxes and barrels; none of the tobacco showed any signs of heating or damage.

During the period the offloaded cargo was in lighters at Aden, there were four watchmen on each lighter to see that the cargo was properly ventilated and protected from the elements with tarpaulins.

While the vessel was at Aden for repair, the main engines and condenser were idle and not in use.

Within a few hours after the vessel sailed from Aden on January 18, 1941, the condenser commenced to leak and the extent of leakage increased each day until the vessel reached Durban on February 12, 1941.

After taking bunkers at Durban, the vessel on February 16, 1941, went alongside a shipyard to have the condenser repaired, and sailed from Durban on February 25, 1941. The condenser was opened up and examined and it was found that 300 of its 1,132 tubes were worn thin at the ends, and that all 2,264 of

the wooden ferrules required replacement because they had begun to lose their elasticity. The condenser repairs consisted of removing and renewing all ferrules and brazing one end of about 300 tubes out of 1,132 tubes which had been bent in knocking out the ferrules. The brazing was necessary because new tubes were not available to replace those that had been bent.

Due to conditions at Durban created by the war, the condenser repairs took 8 days; in normal times such work would have taken 5 days. At Durban, there was no indication that the tobacco cargo was fermenting or self-heating.

The courses followed by the vessel during the entire voyage were those given to her Master by the British Admiralty. The weather which the vessel encountered throughout the voyage was normal and expectable on that route at that time.

After leaving Durban and while in the South Atlantic Ocean, the vessel at times encountered temperatures of about 110°. On March 28, 1941, while the vessel was some distance off the coast of Brazil, smoke was observed coming out of the ventilators of No. 3 hatch and shortly thereafter a fire was discovered in this hatch which spread to the No. 3 'tweendeck. The crew, with the use of the vessel's hoses, poured water into this hatch in an effort to extinguish the fire.

On March 29, 1941, the Master deemed it advisable, in an effort to extinguish the fire and save the cargo, to proceed to Barbados where the vessel arrived on the morning of March 31st. At Barbados, the vessel was unable to get alongside a dock and she anchored in the roadstead about a quarter of a mile away from the docks; a fire boat came alongside and pumped seawater into the No. 3 hatch.

At the time of the vessel's stay at Barbados there were very limited facilities, such as covered docks, warehouses and lighters, for the storage and reconditioning of tobacco.

The fire in the tobacco in No. 3 hold resulted from the spontaneous heating and ultimate ignition of the tobacco itself.

After the fire was extinguished in No. 3 hatch, all of the tobacco was completely discharged from the No. 3 hold and 'tweendeck to covered lighters and docks, and after the compartments were cleaned out and the tobacco was cool and dry, such part of the tobacco which it was thought might have some value was reloaded into said compartments about April 10th, 1941. A windsail was set up over the No. 3 hatch, but despite this the tobacco again showed signs of heating.

The seat of the fire was located in the No. 3 hold on the starboard side about 12 feet abaft the forward bulkhead and about 3 feet above the tank tops in the area where the shaft tunnel joins the tunnel recess. This was where part of the 4614 bale shipment of the tobacco manupulated and prepared by Yerli Urunler, S.A. and purchased by American Tobacco Company was stowed; it had not been discharged at Aden or otherwise disturbed during the voyage.

On April 2, 1941, the Master, in the company of a Lloyd's surveyor and a government surveyor, made an inspection of the tobacco in Nos. 1 and 2 holds and its condition appeared to be normal except that a number of bales in the after end of the No. 2 hold which appeared to be warm or hot, were discharged. By April 3, 1941, the temperature of the hold appeared to be normal.

There was no damage to the tobacco in the No. 1 hold or in No. 2 hold by fire or by water used to extinguish the fire.

Thereafter daily examinations of the tobacco in No. 1 hold and the remaining tobacco in No. 2 hold were made by the Master and the surveyors, who found everything to be normal without any evidence of the bales being heated or damaged until April 11, 1941.

On April 11, 1941, it was discovered that there was a depression in the tobacco

stow in No. 1 hold and that the tobacco was heating excessively. The surveyors ordered the discharge of about 8,000 bales which, after they were cooled, were subsequently restowed, part being placed in the No. 2 hold.

On April 12th the surveyors, during the course of their inspection of No. 2 hold, discovered bales of tobacco at the forward end of that hold that were heated and steaming, and efforts were made to arrest this condition.

On April 19, 1941, a surveyor appointed by the libelants and their underwriters and the general average adjuster came to Barbados. This surveyor after making his inspection deemed it advisable, because of the limited facilities and conditions prevailing at Barbados, for the ship to reload the tobacco that had been removed from the holds and to proceed as soon as possible to Norfolk.

The vessel sailed from Barbados on April 22, 1941, and arrived at Norfolk on May 3, 1941, where during the next 4 days she discharged her cargo consigned to that port and then proceeded to New York where she arrived on May 8, 1941, where the balance of her cargo was discharged.

A survey of the tobacco discharged from the No. 1 hold revealed that some bales in each of the shipments were in sound condition, while others were partially damaged or worthless due to fermentation and self-heating of the tobacco. The number of bales that were sound, partially damaged and worthless in each of the shipments in No. 1 hold is set out in a schematic diagram received in evidence as Owners' Exhibit 89.

A survey of the tobacco discharged from No. 2 lower hold revealed that 8 of the 12 shipments stowed in that hold outturned sound, 5 of which were stowed at the bottom center of that hold, and that a number of bales in the remaining 4 lots were partially damaged or worthless. The location of those shipments as stowed, with the number of bales in each lot that were sound, partially heated or worthless, is shown in a schematic diagram received in evidence as Owners' Exhibit 89.

A survey of the tobacco stowed in No. 3 hold and 'tweendeck revealed that many of the bales were damaged in whole or in part by fire, water, smoke and heat.

A survey of the olive oil drums consigned to Victor Cory & Company and Pompeian Olive Oil Corp., from which there was leakage of olive oil, revealed that the leaking drums were old drums that had been reused and had been dented or started during the voyage.

A survey of the cases and barrels of cheese stowed in the poop deck and in No. 4 lower hold revealed that the cheese was a soft Greek cheese that had melted and spoiled due to the high temperatures experienced on the voyage.

Throughout the voyage the cargo compartments were ventilated, both day and night at sea and while in port, by opening the hatches and trimming the cowls of the ventilators, except on 7 days when adverse weather conditions prevailed and except during bunkering in order to prevent coal dust from entering the hatches.

Throughout the voyage the cargo compartments were inspected and every 2 or 3 days the ship's officers entered the holds and 'tweendecks in which the tobacco was stowed to inspect the cargo and to observe the temperatures of the compartments and whether there was any unusual odor. Prior to March 28, 1941, the air coming out of the ventilators of No. 3 hatch and through the weather deck hatch was free from odor and was normal in temperature, and there was no lowering of the level of the stow of tobacco in No. 3 lower hold.

Prior to April 11, 1941, which was after the vessel's arrival at Barbados, the air coming out of the ventilators of Nos. 1 and 2 holds and through the weather deck hatches was free from odor and was normal in temperature, and there was no lowering of the level of the stow, except that on April 2, 1941 bales at the after end of No. 2 lower hold were warm, and were discharged.

There was no evidence of ship's sweat in the vessel's compartments or ship's sweat damage to the cargo upon discharge at any port.

It was not usual or customary to rig windsails on the hatches of vessels carrying tobacco, and it was not proved that windsails could or should have been rigged over the hatches to increase the circulation of air.

It was not usual or customary to stow tobacco with horizontal and vertical rice ventilators through the stow or to leave an athwartship empty space through the stow in the way of the square of the hatch extending from the bottom of the hold to the top thereof.

All of the cargo excepting the shipment of the cheese was properly stowed in accordance with the custom and usage in the trade for a voyage to the United States via Gibraltar. In respect to the care and custody of the cargo and the prosecution of the voyage actually made, the Master, under all the circumstances, exercised all possible due diligence, sound discretion and prudent judgment, and took action he deemed most expedient and in the best interest of all concerned.

The fermentation and self-heating and consequent damage to the tobacco stowed in Nos. 1, 2 and 3 lower holds and No. 3 'tweendeck, including the spontaneous combustion and fire in said latter hold and 'tweendeck, occurred because the tobacco in certain bales at time of shipment was more susceptible to self-heating than other bales and because of the length and climatic conditions of the voyage undertaken via Suez and the Cape of Good Hope following the outbreak of war between Italy and Greece. The damage was not caused by any fault of the vessel, her owners, officers or crew.

The fire in the No. 3 hold and 'tweendeck was not the result of the design or personal neglect of the vessel owners, and none of the vessel owners had privity or knowledge of any fault which occasioned the fire or damage to the cargo therein.

At the outset, we summarily stated that we found that libelant R. J. Reynolds Tobacco Co. was the party beneficially interested in the cargo for which it seeks to recover. The respondent "Greek Line" questions the right of this libelant Reynolds to sue. It is desirable that we make specific findings as to this. We note that the respondents Goulandris do not raise this issue, and in the cross-libel filed by them for general average contribution they alleged that R. J. Reynolds Tobacco Co. was the owner and holder of the bills of lading and of cargo claimed by it in these suits.

The proctors for the libelant R. J. Reynolds Tobacco Co. moved at trial for leave to amend the libel by either adding Glenn Tobacco Co. Inc., or substituting it in place of R. J. Reynolds Tobacco Co., or by including an allegation that R. J. Reynolds Tobacco Co. sued as a representative of the legal owner of the cargo. Decision was reserved; although such amendments are unnecessary in view of the posture of the pleadings and of our findings and conclusions, the motion is granted as to the last relief sought. For long since the filing of these suits, "Greek Line" has known of the claims of this libelant; the claim of this libelant has been no surprise to "Greek Line" and certainly no prejudice can result from such an amendment (Keystone Telephone Co. v. U. S., D.C., 49 F.Supp. 508; cf. Levison v. Deupree, 345 U.S. 648, 73 S.Ct. 914, 97 L.Ed. 1390).

Glenn Tobacco Co. Inc. is the wholly owned subsidiary of R. J. Reynolds Tobacco Co. It bought and prepared Turkish tobacco during 1939 and 1940 for no one other than R. J. Reynolds Tobacco Co. The funds to purchase this tobacco in suit and expended to prepare it for shipment were supplied by R. J. Reynolds Tobacco Co. and charged to Glenn Tobacco Co. Inc. as an advance against these tobacco purchases; the freight for carriage was paid for by R. J. Reynolds Tobacco Co. and charged to Glenn Tobacco Co. Inc. Further, upon arrival of the cargo at the Winston-Salem plant of Reynolds and on comple-

tion of computations, the value of the tobacco was credited on June 30, 1941 by R. J. Reynolds Tobacco Co. against the advances made. R. J. Reynolds Tobacco Co. is a proper party libelant.

At the threshold of the consideration of the evidence we are met with the answers of "Greek Line" pleading in effect that it has been named a respondent only because bills of lading issued for the voyage were upon printed forms of the "Greek Line" and that it has been sued as a common carrier despite the fact that it was not the owner or operator of the vessel, that it was not a party to the contracts of carriage and that the use and issuance of bills of lading on these printed forms was entirely without its authorization and without any right or agency to so use or issue them. It is to the factual issues and legal questions raised by these answers that we must now address our attention.

Libelants contended at trial that respondent "Greek Line" is liable as a joint carrier with the owners by reason of its acts and undertakings, and that it also is liable because respondent "Greek Line" in fact, is not a separate and distinct corporate entity. This first contention is premised upon the position of the libelants that by the issuance of bills of lading upon printed forms of "Greek Line" and by direct contractual dealings "Greek Line" undertook to be joint carriers with respondents Goulandris Brothers. By the second contention the libelants urge that the affairs of "Greek Line," its business and its management were so intermingled and merged with the maritime operations of the respondents Goulandris Brothers that with respect to the matters in suit "Greek Line" and Goulandris Brothers were in law one and the same and that both are therefore jointly and severally liable to the libelants.

It is upon allegations now made at trial that libelants urge that by reason of "tangled relations" between the Goulandris Brothers interests and the "Greek Line" (Cf. Kyriakos v. Polemis (The Theomitor), D.C., 63 F.Supp. 19, 1945

A.M.C. 439, affirmed Kyriakos v. Goulandris, 2 Cir., 151 F.2d 132, 1945 A.M.C. 1041), and upon what has been called an alleged "scrambling" of interests and activities of the respondents that libelants would have us disregard "Greek Line" as a corporate entity distinct from respondents Goulandris Brothers and to hold "Greek Line" jointly liable.

Respondent "Greek Line," because of the allegations of the original libels as filed and the delay of libelants in asserting this claim of "scrambling of interests," objects to libelants being now permitted to advance this theory of liability and to its being entertained by the Court. "Greek Line" further urges, if it be allowed as an amendment to the libels, that the evidence does not support a conclusion that "Greek Line" should be disregarded as a separate corporate entity, (Cf. Coryell v. Phipps, 5 Cir., 1942, 128 F.2d 702; Melmay, D.C.C.Z., 1932 A.M.C. 1396; Shelton Holding Corp. v. 150 East Forty-eight St. Corp., 1934, 264 N.Y. 339, 191 N.E. 8. And this brings us first to an examination of the libels and of the answers.

The libel of the American Tobacco Company, Inc. was filed on May 15, 1941. "Greek Line" served its answer on July 16, 1941. The Bank of Greece libel was filed on May 7, 1942; "Greek Line" answered on July 16, 1943. These libels allege that the shipments in suit were delivered to the respondents Goulandris Brothers, "Greek Line" and General Steam Navigation Company, Ltd. of Greece for carriage on the S.S. Ioannis P. Goulandris; that "Greek Line" employed the S.S. Ioannis P. Goulandris in its business and that the respondents agreed to carry the shipments, as common carriers, in accordance with certain bills of lading issued by or on behalf of respondents or either of them.

"Greek Line" by answers denied ownership and control of the vessel, that it was a party to the contract of carriage, that the bills of lading were issued on its behalf and denied receipt of any freight moneys for its own account. Goulandris Brothers filed answers to the libels ad-

mitting ownership and operation of the S.S. Ioannis P. Goulandris, their agreement to carry and receipt of the cargo, admitting that bills of lading were issued on their behalf and that they transported the goods on board the S.S. Ioannis P. Goulandris.

The libels do not allege any "scrambling" of the business activities of the respondents. The answers of all respondents clearly allege that "Greek Line" was not a party to the contracts of carriage or in any way connected with the voyage except as New York Agent for the vessel.

"Greek Line" impleading petitions were filed under the 56th Admiralty Rule against Goulandris. Goulandris' answers admit the material facts but deny liability.

It appears, of record in these suits, that in August 1945, after a judicial stay of proceedings due to war conditions, libelants served interrogatories, which inquired into the relationship existing between "Greek Line" and Goulandris Brothers and Goulandris Brothers (Hellas) Ltd. and sought the identity, authority, activities of the respective respondents, officers, representatives, agents and employees in connection with the matters in issue. In February 1946, Chief Judge Knox on "Greek Line's" exceptions to these interrogatories on the ground the interrogatories were not in support of the libelants' case as pleaded held that they should be answered because "The libel as it stands asserts liability either jointly or severally against all respondents" (1946 A.M.C. 303). Judge Knox did not pass on the "scrambling" issue or the necessity for amendment of the pleadings to present that issue.

"Greek Line" and Goulandris Brothers served their answers to the interrogatories on April 18, 1946. Libelants did not then move to amend the libels.

Although interrogatories, discovery and inspection have been had and voluminous depositions have been taken inquiring into the relationship, libelants have not amended their libels to allege this "scrambling". However, although libelants have not so alleged in the libels or sought to amend before trial, we conclude that they are not now foreclosed from raising such a claim at trial. We have so concluded especially since the respondents have long been advised by discovery steps taken that such a claim might well be urged at trial, and have prepared to meet it by their own discovery proceedings and may not now claim surprise. We therefore consider this claim of libelants against "Greek Line" upon the merits and examine the evidence bearing upon this issue.

In 1939, the government of Greece sought to re-establish a steamship passenger service under the Greek flag between North America and Greece, which had been discontinued in 1935. The matter was discussed with various Greek steamship owners and operators and at a meeting of shipowners and operators called by the Ministry of Mercantile Marine, they were informed of the government's plan and its intention to subsidize the Line. The Goulandris Brothers were among those who submitted proposals and theirs was accepted by the Greek government. A formal agreement was executed on February 18, 1939, between the Goulandris Brothers and the Ministers of Finance and Mercantile Marine, who signed on behalf of the government. This agreement provided for the formation of a corporation to operate the service. The purpose of forming the corporation was to have it assume the rights and obligations of the Goulandris Brothers. The agreement also provided that the Cabinet and Minister of Mercantile Marine were to appoint two members to the Board of Directors of the corporation, if the Board was composed of 10 members, and three directors if composed of 11. It provided that the government was to appoint a commissioner to participate in all meetings, who was to report to the Ministers of Finance and Mercantile Marine regularly. In addition, the government was to examine the books of

account and have representatives aboard the ship.

It was thus that respondent General Steam Navigation Company, Ltd. of Greece ("Greek Line"), was incorporated under the laws of the Kingdom of Greece. As organized, "Greek Line" had two classes of stock: founder's stock, and what might be termed common stock. "Greek Line" common stock consisted of 64,974 shares, and 1,650 shares of founder's stock which had no voting rights and never paid any dividends.

Each owner of 75 shares of stock was entitled to one vote but the holders of fewer shares could pool their shares and make up the required number for voting. The shares or certificates were in fact common stock with dividends payable to bearer on coupons attached for each year. Who were the stockholders was determined at the time the then holders made application to collect a dividend by presenting coupons or when a general meeting of all stockholders was called at which time each stockholder exhibited or deposited his shares in order to participate in the meeting. Possession of the shares or certificates determined who the stockholders were.

The founders' stock was entitled to 25% of all profits above the reserve funds and the dividends declared on the common stock; the latter to such dividends as might be declared. To assure dividends of at least 6%, the government had agreed to subsidize "Greek Line" up to 12,000,000 drachmas annually.

Originally, the brothers Goulandris owned all the stock of "Greek Line", of both classes; and at the time of the voyage here involved they still owned all of the founders' stock, in equal shares. Prior to October, 1940, they had disposed of part of their holdings of common stock, each remaining owner of 5,000 shares (15,000 for the three) out of a total of approximately 64,500 shares outstanding. At the time of the voyage in suit, Basil, Leonidas and Nicholas Goulandris then each owned but 5,000

shares of the common stock and ⅓ of the founders' stock. At that time, too, Basil Goulandris was Chairman of the Board of Directors of "Greek Line"; his brother Nicholas was Managing Director; his brother Leonidas was General Manager; and their brother-in-law, Michael Louloudis, was Manager.

As provided by its articles of incorporation, "Greek Line" was managed by a Board of Directors consisting of 11 members, 8 of whom were elected by the stockholders, 2 appointed by the Greek government and a third government-appointed directors and Commissioner, the Board had one vote and a majority vote decided any matters that came before the Board. Except as to the government-appointed directors and Commissioner, the remaining 8 members of the Board were elected at annual meetings of the stockholders.

The day-to-day maritime operations of "Greek Line" were carried on by an agent, Goulandris Bros. (Hellas) Ltd. Hellas was a Greek corporation, organized in 1935. The three brothers Goulandris and their brother-in-law, Michael Louloudis, were its officers in 1940, holding the same positions as they held in "Greek Line". They were also directors. The brothers Goulandris owned all the stock of Hellas in 1940, in equal shares. Hellas acted as agent or chartering broker for shipowners and operators of vessels including many ships in which Goulandris Brothers did not have any interest. The company had no vessels of its own. "Greek Line" did not own any stock in or in any way control Hellas. Hellas did not own any stock in or in any way control "Greek Line".

A third corporation whose name appears in the suit, Goulandris Bros. Ltd. of London, a British corporation, was agent for "Greek Line" and for Hellas Co. in London. The brothers Goulandris owned 60% of its stock, and Nicholas Goulandris was a director.

After its organization "Greek Line" acquired and operated the S.S. Nea Hellas.

The Greek government-appointed Commissioner was present frequently in the "Greek Line" office, checked the books and participated in the control and administration of the corporation as the representative of the Greek government, Ministry of Mercantile Marine. He also went aboard the S.S. Nea Hellas and made inspections. Thus, financial control and supervision of the "Greek Line" was exercised by the Government pursuant to the agreement of February 18, 1939. The Board of Directors never authorized the use of "Greek Line" funds for other purposes than "Greek Line" business. The "Greek Line" did not own, operate or control any vessel other than the S.S. Nea Hellas.

"Greek Line" set up an office in New York in 1939 to solicit freight and passengers, collect fares and freight of the S.S. Nea Hellas payable in New York and to take care of other agency activities of that vessel. In the course of time, the New York office acted on a commission basis as local agent for vessels of varying ownerships, other than the S.S. Nea Hellas, when those vessels came to New York. When "Greek Line" collected funds for the owners of other vessels, the money was deposited in a Special Account. Funds collected in connection with the S.S. Nea Hellas were maintained in a "Greek Line" account, separate and apart from the Special Account.

"Greek Line" and Hellas maintained separate offices and staffs. Hellas had an office on the first floor of the Vatis Building in Piraeus. "Greek Line" had an office on the third floor; they did not have any property in common and had separate employees.

In 1939 Hellas was appointed by "Greek Line" to act as agent for the S.S. Nea Hellas at Piraeus and received a 5 per cent commission. Hellas handled the details of the S.S. Nea Hellas' operations such as customs, ship's papers, bookings, issuing bills of lading and passenger tickets at Piraeus.

The S.S. Nea Hellas never called at Turkish ports or Greek ports other than Piraeus. Cargo for the S.S. Nea Hellas booked at other ports was booked by agents appointed by "Greek Line," which cargo was carried by local steamers to Piraeus and transshipped there to the S.S. Nea Hellas.

Hellas' activities for vessels other than the S.S. Nea Hellas were conducted through agents or sub-agents at various loading ports in Greece or Turkey. At Izmir and Cavalla the agents used by the "Greek Line" for cargo to be transshipped to the S.S. Nea Hellas at Piraeus were entirely different from the agents used by Hellas for cargo ships.

The ownership of the S.S. Ioannis P. Goulandris was divided into 100 shares. Basil Goulandris, Leonidas Goulandris and Nicholas Goulandris each individually owned 30 shares and of the 10 remaining shares, 6 were owned by relatives and 4 by non-relatives. The vessel appeared in Lloyd's Register as owned by "Goulandris Bros." Each of the three brothers had interests in other vessels but they were not all interested in the same vessels. The owners of the S.S. Ioannis P. Goulandris were the only persons interested in the freight or earnings of the vessel for the transportation of the cargo in suit. "Greek Line" did not have any interest in the S.S. Ioannis P. Goulandris nor its freight, nor earnings, nor losses.

██ It is upon this evidence that libelants rely to sustain their claim that "Greek Line" in 1940 was a mere instrumentality of Goulandris Brothers; the evidence is patently insufficient to establish this. "Greek Line" was not controlled by the Goulandris Brothers or by Hellas; its affairs and operations were not so intermingled with these other companies as to justify a disregard of its separate corporate entity. "Greek Line" was not organized to defraud creditors or to evade existing obligations. The fact that some stockholders and officers were common to both is not of itself sufficient to render "Greek Line" liable for the acts of either Goulandris Brothers or of Hellas. (Owl Fumigating Corp. v. California Cyanide Corporation,

3 Cir., 1928, 24 F.2d 718, affirmed 3 Cir., 30 F.2d 812; Crane & Co. v. Fry, 4 Cir., 1903, 126 F. 278; McLean v. Goodyear Tire & Rubber Co., 5 Cir., 1936, 85 F. 2d 150; Kentucky Electric Power Co. v. Norton Coal Mining Co., 6 Cir., 1938, 93 F.2d 923; Matter of Green's Estate, 1921, 231 N.Y. 237, 131 N.E. 900.

We come next to libelants' claim that "Greek Line", although not the owner or operator of the vessel, was a party to the contracts of carriage. This claim is premised primarily upon the fact that the bills of lading covering the cargoes in suit (save only some of those issued at Cavalla, which were upon the forms of the "Greek Coast Line" and these we refer to later) are on the printed form of "Greek Line" and read in part in print:

> "Received by General Steam Nav. Co. Ltd. of Greece, hereinafter called the carrier, * * *."

It appears that some were signed by the Master, some by Hellas Co., and some others by the General Manager of "Greek Line"; that the freight was collected either by Greek Line, or by Hellas; and that the cargo was delivered against surrender of these bills of lading.

With respect to this aspect of libelants' claim, "Greek Line" contends that it was not a party to the contracts of carriage, that the use of its printed forms of bills of lading was unauthorized; that no one had actual or apparent authority to contract for the carriage on its behalf; that the libelants and their agents knew that they were not contracting with "Greek Line"; and that, even if it should be held that "Greek Line" was a contracting carrier for the original voyage to the United States ports via Gibraltar, these contracts were terminated by the advent of war between Italy and Greece which made the voyage impossible and "Greek Line" was not a party to the arrangements for the new voyage subsequently made via Suez.

We examine the evidence bearing on these issues and make the following findings:

We have found that Hellas was appointed by the owners to look after the business affairs of the S. S. Ioannis P. Goulandris. When the vessel carried general cargo, Hellas received the customary 3 per cent commission, and one third of 5 per cent when the vessel carried full cargoes.

Hellas had a supply of "Greek Line's" printed forms of bills of lading for use by it in its capacity as agent for the "Greek Line" for cargo to be carried on the "Greek Line's" only vessel, the S. S. Nea Hellas, which was a berth vessel, engaged in regular service between Piraeus and New York. "Greek Line" forms of bills of lading had never been used for shipments on any other vessel.

The owners for which Hellas acted as agent owned tramp steamers, such as the S. S. Ioannis P. Goulandris and did not have their own forms of bills of lading;—charterer's forms usually were used. Hellas, the owners' agent at Piraeus, previously had had no occasion to have forms of bills of lading in connection with their work as agent for the owners of these tramp steamers. These owners had not put their vessels on the berth in a regular service.

When the S. S. Ioannis P. Goulandris was put on the berth, neither Hellas nor the owners of the vessel had forms of bills of lading of their own. Alexandros Firios, an employee of Hellas whom the brothers Goulandris describe as a "chartering clerk"—decided to use Greek Line forms after deleting the corporate name of the Greek Line wherever it appeared on the forms. He discussed this with Leonidas Goulandris, the officer and director of Hellas who was in charge of such matters for the owners, and he approved of it. Leonidas Goulandris instructed Firios to delete all reference to Greek Line where it appeared in the forms and to substitute Hellas. He also instructed Firios to be sure to see that these deletions were made on the bills of lading and on all other forms used.

Firios did not personally make the deletions and changes but gave instructions

to one of his assistants to do so. On the way to Izmir the vessel was routed to call at Andros and Firios gave instructions to his assistant to prepare a parcel of forms of bills of lading, with deletions of the Greek Line corporate name from them and forward them from Piraeus to Andros for the Master to use at loading ports as needed. This assistant did send the forms as directed but failed to make the deletions and substitutions. Firios did not check to see whether the assistant had carried out his instructions.

The Master was instructed to deliver the forms to Sperco, the vessel's agent at Izmir. The Master, without examining them, delivered them to one Arcas who, meanwhile, had replaced Sperco as the vessel's agent just before the ship arrived. At that time the relations between Italy and Greece were strained, and it appears that Arcas was of Greek, while Sperco was of Italian origin.

At Izmir, the Master, Polemis, signed and issued bills of lading on the "Greek Line" forms, without correction or change. Polemis was not employed by, connected with or authorized by "Greek Line" to sign these bills of lading on its behalf.

The arrangements for the shipment of the tobacco shipped by Gary Tobacco Company at Izmir had been made at New York between the New York office of that company and the New York office of "Greek Line", which acted on instructions of the Hellas Company. The form of bill of lading issued for this shipment was, as we have found, on the form of "Greek Line", unchanged, and by its printed terms acknowledged receipt of the cargo by "Greek Line".

There is no evidence as to the booking of the olive oil shipments from Izmir. The bills of lading issued for them were on the form of "Greek Line", unchanged in any way. The forms of bill of lading reached Izmir in the same way as that employed for the Gary shipment.

The arrangements for the four shipments of tobacco by Yerli Urunler, S. A. and by the American Tobacco Company of the Orient, Inc. from Izmir were made at Piraeus between Walter Gout, Manager of the Athens office of the American Tobacco Company of the Orient Inc. and the Hellas Company. The forms of bill of lading issued for the shipments were the printed forms of "Greek Line" without any change.

The arrangements for the shipment of the tobacco by Glenn Tobacco Company, Inc. from Izmir, Cavalla and Salonica and by A. Michaelides, S. A. from Salonica were made at Piraeus between R. E. Taylor, Manager of the Athens office of Glenn Tobacco Company, Inc. and the Hellas Company. The form of bill of lading issued for the shipment made at Izmir was on the printed form of "Greek Line", unchanged. At Cavalla, one Evangelinos, who was the agent of the owners of the S. S. Ioannis P. Goulandris prepared and issued receipts for the tobacco which were mailed to Piraeus where Hellas prepared and issued the bills of lading. This agent had no printed forms of receipts with appropriate heading and used the forms of the "Greek Coast Lines" after deleting the heading and typing "Hellas" in its place. The Greek Coast Lines had no connection whatever with "Greek Line", Hellas, Goulandris Brothers and/or the owners of the S. S. Ioannis P. Goulandris. Evangelinos did not act for "Greek Line". The "Greek Line" agent at Cavalla was one Combolytis, who had nothing to do with the S. S. Ioannis P. Goulandris, her cargo or with the shippers of her cargo. The bill of lading was signed by the Hellas Company as General Agent by Leonidas Goulandris.

At Salonica, Garofallou was agent for the owners of the S. S. Ioannis P. Goulandris for whom he had acted since 1930. He booked all the cargo shipped on the S. S. Ioannis P. Goulandris at Salonica for and on behalf of the owners. Garofallou had "Greek Line" forms of bills of lading in his office; he had acted as agent for the S. S. Nea Hellas on four or five occasions in connection with cargo received at Salonica for the S. S. Nea Hellas. On instructions he had received

164

from Hellas, he used these forms. Garofallou prepared, issued and signed all the bills of lading covering cargo loaded on the vessel at Salonica except those covering the shipments of Glenn Tobacco Company, which the Master Polemis signed at Garofallou's office. He deleted the name of the "Greek Line" appearing as the heading of the bills of lading and typed in the name of "Hellas". Neither Garofallou nor the Master Polemis were employed by or in any way authorized by "Greek Line" to sign the bills of lading on its behalf. Subsequently, the bills of lading covering the Cavalla Papastratos shipment were replaced by another set prepared by Hellas and signed by Hellas at Piraeus.

Examination of the bills of lading issued for the two Glenn shipments at Salonica, and for the Michaelides shipment from that port, show them to be on the form of "Greek Line" on which "Greek Line's" corporate name has been crossed out on a typewriter, and the name of the Hellas Company typed in over it.

The arrangements for carriage of the two Papastratos shipments (3,684 bales from Salonica and 1,956 bales from Piraeus) were booked by an exchange of letters at Piraeus. On October 4, 1940, following a telephone conversation, Papastratos Bros. wrote to Goulandris Brothers confirming the booking of 150 tons of tobacco from Cavalla, Salonica and Piraeus to New York; and on October 5th the Hellas Company replied confirming the booking. Chryskinis, financial and export manager of Papastratos Bros., in making the arrangements for shipment, dealt directly with one of the Goulandris Brothers. The bill of lading for the Salonica shipment was on the "Greek Line" form, with the name of the Hellas Company rubber-stamped over the corporate name of "Greek Line"; and it was signed for the Hellas Company, General Agent, by Leonidas Goulandris. The bill of lading for the Piraeus shipment was on the form of "Greek Line" without any change, and was signed in the same

way as the other bill of lading by Leonidas Goulandris.

The shipment made by A. Camaras & Co. at Salonica was booked by letter from Camaras to the Hellas Company at Piraeus through the latter's Salonica agent. The bill of lading is on the "Greek Line" form with the name of "Greek Line" crossed out on the typewriter and the name of the Hellas Company typed over it. The bill of lading was signed "The Agent" by P. Garofallou. Antonios Camaras of Camaras & Co. is a material witness in relation to the booking of the cargo and the issuance of bills of lading. Mr. Camaras' testimony was not taken although there was opportunity to do so during the many years intervening before trial. No proof was offered as to why his testimony was not taken.

There is no evidence as to the booking of the shipment of cheese from Salonica. The form of the bill of lading and the signature were identical with those issued in connection with the Camaras shipment.

Specifically, we find that the bill of lading issued to Pialoglou Sons at Cavalla for 1,110 bales of tobacco (Exhibit 27 L), the bill of lading issued to Glenn Tobacco Co. at Cavalla for 8,837 bales of tobacco (Exhibit 27I), the bill of lading issued to Papastratos Freres at Salonica (Thessaloniki) for 3,684 bales of tobacco (Exhibit 27M), and the bill of lading issued to Papastratos Bros. at Piraeus for 1,956 were all prepared and issued at Piraeus. They were presented to Leonidas Goulandris when he returned to Athens on November 13 or 14, 1940, after the S. S. Ioannis P. Goulandris had sailed. He testified that they had been signed by him without his noticing if any changes or deletions had been made on the forms, and at a time of great confusion and excitement resulting from the outbreak of war, when bombs were being dropped outside his office and everybody was running and shouting. Leonidas Goulandris, when he signed them, was not in any way authorized by "Greek Line" to sign those bills of lading, or

any bills of lading for the S. S. Ioannis P. Goulandris cargo, on its behalf.

We digress for a moment to make the following observations:

1. Walter Gout, an executive of the American Tobacco Co. Inc. of the Orient at Athens, the wholly owned subsidiary of American Tobacco Co., was a material witness in relation to the booking of and the making of the contracts of carriage for American's shipments. Libelant, American Tobacco Co. did obtain an order for a Commission to take the testimony of Gout; it served direct interrogatories and respondents served cross-interrogatories, but his testimony was not taken during the many years before trial.

2. Quill, the assistant to Charles B. Gary, Secretary and Treasurer of Gary Tobacco Co., the wholly owned subsidiary of libelant, Liggett & Myers Tobacco Co., was a material witness who had a conversation with Joseph Pascale of the "Greek Line" New York Office and was also present during the conversation between Charles B. Gary and Joseph Pascale in New York in October 1940 regarding the shipment of tobacco from Izmir by Liggett & Myers Tobacco Co. Quill's testimony was not taken during the years before trial.

3. Eric Giraud, Assistant Superintendent of Manipulation for Gary Tobacco Co. at Izmir, F. A. Turner, an employee of Gary in Greece and Bell, an employee of Gary at Izmir, were witnesses in a position to give material testimony concerning the efforts of Gary Tobacco Co. and Liggett & Myers Tobacco Co. to find space in vessels to ship out the Liggett & Myers tobacco, and the arrangements for the carriage of their tobacco, and also the buying, preparing and shipping of the tobacco. Bell also had information in relation to the rerouting of the vessel to go via Suez and the matter of increased freight. The testimony of these men was not taken before trial and no evidence was offered as to why their testimony was not taken.

4. Higginbotham, the head of the Izmir office of Gary Tobacco Co. was a material witness concerning with whom the contracts of carriage for the Liggett & Myers shipment were made. His testimony was not taken although it could have been during the many years intervening before trial.

5. Messrs. Higginbotham, Donaldson and Cohen of Glenn Tobacco Co. Inc., the wholly owned subsidiary of libelant, R. J. Reynolds Tobacco Company were material witnesses who booked the Glenn shipments with Evangelinos Sons at Cavalla; their testimony was not taken before trial, and no evidence was offered as to why it was not taken.

We find that the evidence clearly establishes that the "Greek Line" forms of bills of lading, issued for the cargoes in suit were used without the knowledge or consent, express or implied, of the "Greek Line"; that those who issued them did not represent or purport to issue them for or on behalf of the "Greek Line"; that no one had any authority to book cargo for or on behalf of the "Greek Line" or issue "Greek Line" bills of lading for cargo loaded on the S. S. Ioannis P. Goulandris nor to contract on behalf of the "Greek Line" with respect to such cargo; that none of the cargo in suit was at any time delivered to the "Greek Line" or anyone employed by or acting for it and the "Greek Line" was not the carrier of the goods on the S. S. Ioannis P. Goulandris.

It also appears that the fact that the Greek government agreed to the purchase and operation of the Nea Hellas and to the formation and supervised control of the "Greek Line" by the Greek government, (Greek Line Exs. 2–2a) was published in full in the government record of May 7, 1939 and the "Greek Line" articles of incorporation (Greek Line Exs. 3–3a) were published in full in the government record of July 8, 1939 and, by reason of such official publications, the authority of and limitations of the "Greek Line", its officers and directors, were matters of public knowledge for over a year before the S. S. Ioannis P. Goulandris' voyage.

"Greek Line" was not engaged in business as a common carrier of merchandise by water for hire between the ports of Izmir, Salonica (Thessaloniki) and Cavalla and the ports of Norfolk, Newport News and New York and did not employ in its said business the S. S. Ioannis P. Goulandris, as alleged in the libel. "Greek Line" did not have delivered to it separately or jointly with Goulandris Brothers the shipments in suit nor did the "Greek Line" with Goulandris Brothers accept the cargoes in suit or agree to carry it from the ports of shipment to the ports of destination and deliver it in accordance with the terms and conditions of bills of lading issued, by or on behalf of "Greek Line" "and/or" the Goulandris Brothers in consideration of certain freights, as alleged in the libel. "Greek Line" did not separately or with Goulandris Brothers load and stow the cargo on board the S. S. Ioannis P. Goulandris for carriage from the ports of loading to the ports of destination.

Respondents, Basil, Leonidas and Nicholas Goulandris, were the owners and operators of the S. S. Ioannis P. Goulandris; the bills of lading covering the cargoes in suit are their contracts of carriage and the voyage and venture of the S. S. Ioannis P. Goulandris is admitted by them to be theirs.

All of the libelants, their representatives, subsidiaries and predecessors in interest, knew that they were contracting with the vessel's owners or Hellas, agent for the owners, and not with the "Greek Line" with respect to the shipments in suit, and that "Greek Line" was only New York agent for the vessel, her owners and their agent, Hellas, and that the S. S. Ioannis P. Goulandris was owned and operated by her owners, represented by Goulandris Brothers or their agent, Hellas, who were to be and were the contracting carriers of the cargoes.

The voyage of the vessel as originally contemplated was to be by way of the Mediterranean and through the Straits of Gibraltar. The vessel, as we have found, had loaded cargo between October 16 and 24, 1940 at Izmir, Turkey and at Cavalla and Salonica, Greece. It was planned to complete loading at Piraeus and she arrived there on October 26, 1940. War was declared between Greece and Italy on October 28, 1940 before any Piraeus cargo was taken aboard. It was with the cargo laden at the prior ports still on board, that the vessel was requisitioned by the Greek government and sent on a military mission through the Corinth Canal from which she did not return to Piraeus until November 4, 1940.

It is a fair inference from the evidence although no one knew that the war was so imminent, that all realized that the immediate future was most uncertain and the tobacco shippers, here as libelants, were most anxious to have their shipments under way. This anxiety was increased by actual hostilities and the shippers (particularly, American Tobacco Co., R. J. Reynolds Tobacco Co. and Papastratos Bros., who agreed in writing in advance to pay additional freight) pressed for the Suez passage. It is also a fair inference that the owners of the vessel were not adverse to this and were quite agreeable to any plan which would get the vessel out of the Mediterranean and away from the war theatre and possible further requisitions for military missions. Captain Montsoulas, who replaced Polemis as master, it appears from the evidence, was himself not adverse to this proposal. Firios' objections seemed to have been based upon a fear of future requisitions and uncertainty as to the amount of the additional freight payments which were to be fixed by the Greek government. However, be this as it may, above all else we find that "Greek Line" took no part in and was not represented in these dealings and transactions which culminated in the new voyage through the Suez Canal.

On Sunday, November 10, 1940, Firios represented Hellas and the owners of the S. S. Ioannis P. Goulandris when he attended the meeting with the Greek government officials and the representatives of tobacco shippers. He acted only for them, when he, under protest, signed

the agreement on behalf of the owners for the S. S. Ioannis P. Goulandris to proceed on the voyage via Suez and to accept the decision of the Government Committee as to additional freight. We have found that subsequent to the vessel's sailing via Suez, the Committee fixed as additional freight, 88 per cent of the original freight. The records of the meeting make note of the appearances of "Goulandris Bros.", "Goulandris (Hellas)" and make no mention whatever of the "Greek Line." Representatives of libelants, American Tobacco Co., Reynolds Tobacco Co., and Papastratos and of Krokos & Mouzelis Bros., one of Pialoglou's shippers, were at the meeting and agreed to the Suez route and each subsequently paid the additional freight as did all the other libelants.

All present at this meeting of November 10, 1940, knew they were dealing with Firios as the representative of the owners of the S. S. Ioannis P. Goulandris and not with the "Greek Line." The contracts to proceed from Piraeus to this country via Suez at a different freight rate were new contracts and agreements.

██ The inability of the vessel to proceed on the original voyage by way of the Mediterranean excused performance (Allan-Wilde Transport Corp. v. Vacuum Oil Co., 1918, 248 U.S. 377, 39 S. Ct. 147, 63 L.Ed. 312; Edward Maurer Co. v. Tubeless Tire Co., D.C.1921, 272 F. 990, affirmed 285 F. 713; Bank Line, Ltd. v. Arthur Capel & Co., (1919 A.C. 435). Even if it should be held that "Greek Line" was a joint carrier on the originally contemplated voyage (and we have held to the contrary) any obligation on its part to perform no longer existed (Texas Co. v. Hogarth Shipping Co., 1921, 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123; The Tornado, 1882, 108 U.S. 342, 351, 2 S.Ct. 746, 27 L.Ed. 747).

██ So, too, it seems that the requisition of the vessel by the Greek Government operated to frustrate the voyage and justified non-performance by any original carrier (Allan-Wilde Transport

Corp. v. Vacuum Oil Co., 1918, 248 U.S. 377, 39 S.Ct. 147, 63 L.Ed. 312; Texas Co. v. Hogarth Shipping Co., 1921, 256 U.S. 619, 41 S.Ct. 612, 65 L.Ed. 1123; The Claveresk, 2 Cir., 1920, 264 F. 276).

But, in any event, we have concluded that new contracts of carriage were entered into for the vessel to proceed through the Suez and that to these "Greek Line" was not a party.

We return then to a consideration of the libelants' claims against the three brothers Goulandris as the owners and operators of the vessel. These claims are bottomed upon two principal contentions;—first, that the S. S. Ioannis P. Goulandris was unseaworthy, that due diligence had not been exercised to make her seaworthy and that resultant delays contributed to the losses of cargo; and second, that the stowage, care and custody of the cargo was improper and negligent; that this, with the failure of these respondents to exercise due diligence to make the vessel seaworthy occasioned heating damage to the tobacco cargo in holds numbers 1 and 2 and fire damage to the tobacco cargo in number 3 hold and 'tweendeck; and that such negligence was personal to respondents.

As to these claims of libelants, these respondents urge that the vessel was seaworthy, that they exercised due diligence to make her seaworthy, that the cargo was properly stowed and cared for, and that the damage to the tobacco cargo arose from fermentation and self-heating, that the tobacco when shipped was in a condition which made it unfit for transportation on a tropical voyage, and that the Fire Statute (46 U.S.C.A. § 182) exonerates the respondents from liability for the fire in number 3 hold, because libelants have failed to establish that the fire was caused by the personal neglect of any of the respondents.

Let us look at the evidence bearing upon the first aspect of these claims of the libelants: that the vessel was unseaworthy, that there was a personal failure on the part of the respondents Goulandris with respect to this and that resultant

delays contributed to the cargo losses sustained. The libelants have in answer to interrogatories limited their claim of the structural unseaworthiness of the vessel "to condenser, stern gland, stuffing box, tailshafts and tailshaft bearing". After trial, libelants state in their brief submitted "that the unseaworthiness of which libelants complain related to the vessel's tailshaft, her condenser, and her coal, and the ignorance of her officers of the nature and quality of tobacco". It is to these specifications of unseaworthiness we confine our inquiry; and we do so in the light of libelants' contentions that avoidable and protracted delays in the voyage consequent upon this alleged unseaworthiness existing through lack of due diligence was a cause which occasioned heat to develop in the stow of tobacco, resulting in combustion and other damage to it.

Here, we again note that the vessel was in Port Said, where repairs were made to the condenser from November 15, 1940 to December 1, 1940, a period of almost 16 full days; that she was in Aden for repairs to the tailshaft from December 14, 1940 to January 18, 1941, a period of almost 35 full days; and that she was in Durban for repairs to the condenser from February 16th, 1941 to February 25, 1941, a period of almost 10 days.

It is not in dispute that the respondents Goulandris Brothers and the S. S. Ioannis P. Goulandris were common carriers by sea of libelant's cargo and were parties to a contract for the carriage of goods by sea, in foreign trade, to ports of the United States. There is no dispute that "The Carriage of Goods by Sea Act (46 U.S.C.A. § 1300 et seq.)" governs and is to be applied. Particularly with reference to a claim of unseaworthiness, Section 4 of the Act (46 U.S. C.A. § 1304) sets out in detail the limits of the carrier's exoneration. So far as here relevant, that Section provides:

"(1) Neither the carrier nor the ship shall be liable for loss or damage arising or resulting from unseaworthiness unless caused by want of due diligence on the part of the carrier to make the ship seaworthy, and to secure that the ship is properly manned, equipped, and supplied, and to make the holds, * * * and all other parts of the ship in which goods are carried fit and safe for their reception, carriage, and preservation in accordance with the provisions of paragraph (1) of section 1303 of this title. Whenever loss or damage has resulted from unseaworthiness, the burden of proving the exercise of due diligence shall be on the carrier or other persons claiming exemption under this section."

Section 4, Subd. (1) of the Act (46 U.S.C.A. § 1304(1)) means that a cargo owner claiming damage resulting from unseaworthiness must first prove the affirmative of that issue, and if he does, then the carrier to gain exoneration from liability, must prove that it exercised due diligence. If cargo fails to establish that the ship was unseaworthy in some respect which caused the damage, then the question of due diligence becomes academic. See The Temple Bar, D.C., 45 F.Supp. 608, 613, affirmed 4 Cir., 137 F.2d 293.

Of course, before liability may arise from an unseaworthy condition "there must be a causal connection between the loss and the unseaworthiness" (Hartford & N. Y. Transp. Co. v. Rogers & Hubbard Co., 2 Cir., 40 F.2d 954, 955).

Libelants' claim is that the vessel was unseaworthy when she sailed from Izmir, Cavalla, Salonica and Piraeus. They do not specifically limit this claim to a voyage via Gibraltar or to a voyage via Suez; nor have we in our consideration so limited it. The evidence has been weighed against the broad claim that the vessel was unseaworthy to make either of these voyages.

For the purpose of facilitating the propounding of hypothetical questions to experts the proctors agreed to the contents and substance of two factual state-

ments preliminary to such questions,— one affecting the "Tailshaft Hypothetical Question", the other affecting the "Condenser Hypothetical Question." These statements set forth the details of the operation of the tailshaft and of the condenser, and a full description of their design and mechanism. It is unnecessary to repeat the substance of these statements; we have accepted them as undisputed and refer to their contents in our findings only when it seems required for continuity or clarity.

We consider the evidence bearing upon the tailshaft.

The power generated by the Scotch boilers and triple expansion engine of the S.S. Ioannis P. Goulandris was transmitted through a steel propeller shaft, constructed in sections and weighing about 10 tons. The shaft passed from the engine room through the tunnel recess and the shaft tunnel and out through the stern of the ship to the single screw propeller. It is important to note with reference to libelants' contentions, that the rigid stern tube through which the tailshaft runs is of cast iron and fits in the stern frame.

The vessel had passed her four-year special survey in May, 1937; thereafter, on December 1, 1939, at Dakar, the vessel's rudder wiped or struck a steel barge while swinging; she continued in voyage to Rotterdam, arriving about December 26, 1939 and en route experienced no tailshaft difficulties. A survey later made by the owners showed no movement of the couplings or the coupling nuts. At Boulogne, she lost her anchors when they were dropped to avoid entering a mine field and she then damaged her windlass and hawsepipe. When she put into Rotterdam in December, 1939 for repairs to her windlass, she entered the Waalhaven Shipyard. The Master reported to the Owner's Surveyor Richards that he had had some difficulty in steering the vessel and the vessel was put on a slipway. Here it was found that the rudder was bent and that the stern frame was broken at the sole piece and forced out of position to starboard. The broken area was 8″ x 20″. The sole piece was a heavy casting, and a blow sufficient to break it must have been a heavy blow. The blow which caused it might have caused a misalignment of the tailshaft or stern frame or both; however, it was revealed that none of the shell plates above this casting were broken or distorted. The sole piece itself appeared to have defects from casting and Richards found sizeable air bubbles in the area of the fracture; the sole piece was therefore renewed rather than attempt to weld the break. While this was being done and the vessel was in a dry dock, the owners determined to put the vessel through her four-year special survey and also to draw her tailshaft. This was in February, 1940 and the special survey was not due until May, 1940, three months hence. The usual and standard examination of the hull and machinery was made by Lloyd's surveyors and by an independent marine engineer engaged by the owners.

The tailshaft was drawn; the stern gland packing in the stuffing box and the bottom half of the *lignum vitae* were renewed. The Lloyd's surveyor and the owner's engineer, after the tailshaft had been reset, verified that the tailshaft and intermediate shaft were in proper alignment. This was accomplished by methods and means we find to be in accordance with standard practice, by visual inspection and by taking measurements with feelers at all bearings and at points along the shaft. The clearance of the *lignum vitae* when measured was 1/16 of an inch; the tailshaft, by use of a steel rule, was found central and free of contact in neck ring and stern gland ring with an all round 1/16 of an inch clearance. The couplings, tested with feelers, were found parallel and concentric with the shafting and rested firmly without clearance on the bearings. After the coupling bolts were driven up, the feeler 3/1000 of an inch would not enter between the facings of the couplings.

When the vessel came off drydock on February 8, 1940, she was given a dock test and the Lloyd's surveyor inspected

the shaft tunnel and other parts of the engine room.

We find, that upon completion of the Rotterdam survey in February, 1940, the vessel's tailshaft and intermediate shaft, including the bearings, were all in proper alignment and the tailshaft and all component parts were then in seaworthy condition.

We reject and refuse to accept the contention of the libelants that when making repairs to a vessel, of the nature and extent here involved, it is usual, accepted and customary practice to check the alignment of the stern tube and of the tailshaft by means of a piano wire or a boresight, and we find that the means actually employed were proper and adequate.

After these tailshaft repairs, the vessel made a voyage to South Africa and return to London; from London to the United States, and thence to Spalato; after discharging at Spalato, she proceeded to Izmir; and then to Cavalla, Salonica and Piraeus; then on military mission to Corinth Canal and return to Piraeus; then on the voyage in suit when the tailshaft trouble required repairs.

Thus, from February, 1940, when the vessel's tailshaft had been drawn, inspected and replaced at the Rotterdam survey, to December 12, 1940, the vessel had sailed about 25,000 miles without experiencing any difficulty with her tailshaft or its component and related parts.

As to the cause of the tailshaft trouble which developed aboard, we accept the testimony of the Lloyd's surveyor who inspected the tailshaft at Aden that it resulted from grit or other abrasive foreign material finding its way into the stern tube with the seawater that normally comes in to cool the tailshaft when it is in operation. The record is barren of evidence that the propeller of the vessel touched bottom from the date she sailed from Rotterdam in February, 1940 until December 4, 1940 when she was leaving her anchorage in Great Bitter Lake for Suez as the last vessel of a 65 ship convoy. The vessel had been anchored in shallow water in the lake and as she got under way the propeller churned up dirt and grit and this was observed by one of the officers in the muddy water in the vicinity where the propeller was working. The significance of the incident or of its possible consequences were not then appreciated or realized and it was not logged; that it in fact occurred we are convinced by the evidence and so find. We find that it was at this time that the grit or other foreign substance gained entrance into the stern tube with the normal flow which occurs and operates to cool the tailshaft. We also find that it was these foreign substances which caused the trouble to the tailshaft.

We also find that the evidence establishes that the vessel was seaworthy with respect to her tailshaft at the commencement of the voyage and until December 4, 1940 and that it establishes that respondent owners exercised due diligence.

We also find that the delay at Aden for repairs to the tailshaft could not have been anticipated at the time the cargo was booked and at the time the vessel sailed from Piraeus.

We come then to examine libelants' contentions with reference to the alleged unseaworthiness of the vessel because of the condition of the condenser. We have found that the vessel was in Port Said from November 15, 1940 to December 1, 1940, and in Durban from February 16, 1941 to February 25, 1941 when repairs were made to the condenser.

The vessel was propelled by steam and she was equipped with a condenser. The purpose of the condenser was to convert the steam exhausted from the low pressure cylinder back into water so that it could be re-used. Another effect of the use of the condenser was to provide a vacuum which relieved the back pressure on the low pressure cylinder, allowing the engine to operate more efficiently, with the expenditure of less fuel, to attain a desired speed.

The condenser was a cylindrical water-tight enclosure. At one end of it was a water box into which sea water was led from without the vessel. The sea water passed from the water box through some 1,100 cylindrical tubes from one end to the other and back again, after which it was exhausted overboard. The tubes with the continual passage of sea water through them, attained the temperature of the sea water. Exhaust steam from the exhaust port of the low pressure cylinder was admitted to the condenser at the top; and, striking the cooler tubes, was condensed and was pumped out the bottom of the condenser and thence back to the boilers for reconversion into steam.

Within the condenser, there were two completely independent circulating systems: one for the exhaust steam which was converted into water, and the other for the sea water which cooled the steam to water. To prevent their commingling, it was necessary that all connections be watertight. This was accomplished by having the tubes through which the sea water passed fit into a perforated plate at each end, the joints between tubes and plate being made watertight by means of wooden cylindrical ferrules, which fitted over each end of each tube and filled the space between the outer wall of the tube and the inner wall of the perforation in the plate. If sea water leaks through the tube plates around the end of the tubes into the fresh water, which is being condensed for re-use in the boilers, it contaminates it. Seawater contains 1/32nd more solids than fresh water; and when the contaminated water is used in the boilers these solids precipitate out, and are deposited on the heating surfaces of the boilers. There they form an insulating barrier to the transmission of heat to the water in the boilers, which substantially reduces the efficiency of the power plant, requires the use of more fuel to get up steam, causes a loss in speed of the vessel, and may ultimately lead to collapse of some of the heating surfaces of the boilers themselves, rendering the vessel helpless.

For this reason a careful watch is required to be kept on the density of the boiler water on a vessel. The density is usually measured by means of a salinometer, graduated in eighths or quarters of 1/32nd. It is considered bad practice to allow the density of the boiler water to approach 1/32nd, for when the density reaches 1/32nd, it is that of seawater itself.

When the vessel was undergoing repairs incident to the Lloyd's special survey of May, 1937, the condenser had been overhauled; all the ferrules had been replaced with new ones and the tubes removed and tested, and where required replaced with new tubes. At the special survey of February, 1940, the condenser was again opened up, repaired and then subjected to inspection under hydrostatic pressure; at the test it had been found to be in good condition. Only a few of the wooden ferrules, which visually appeared to be in doubtful condition and failed to meet a knife test, had been replaced.

After this last special survey of February, 1940, the vessel sailed the seas on the voyages we have before detailed and experienced no trouble with the condenser. She stopped on September 28, 1940 at Spalato en route to Izmir, and there the Chief Engineer inspected the condenser and found no fault; it was then in good condition.

The Chief Engineer's Log Book shows that on October 22, 1940 after the vessel had left Salonica a sudden rise of water level in the boilers due to a leak in a tube of the condenser was observed. The engine was stopped and the condenser doors opened and it was found that a ring had come off. The ring was replaced with a new one, and she continued two hours later, "full speed ahead."

The Chief Engineer testified that seawater had at this time leaked into the condenser because one of the wooden ferrules had broken, and that when this was being repaired he examined all the other ferrules and found them in good condition.

The vessel journeyed on after this repair and experienced no difficulty with the condenser until November 11, 1940 the day after she had left Piraeus for Port Said. It was then found that the condenser was leaking and at Port Said at a shipyard, the condenser was opened, some wooden ferrules renewed and some loose nuts and staybolts tightened. After this work, the condenser was tested under water pressure and found tight and in good condition. The tests were sufficient. The vessel was seaworthy with respect to her condenser when the voyage commenced, and respondents did not fail to exercise due diligence to make her so.

We find the log entries of the density of the boiler water to be of no special significance when they are weighed against the fact that it appears that the engine room log book was not fully or completely kept, that on a number of days there is no record of the density of the boiler water. Such entries as do appear noting an increase of boiler water density are adequately accounted for by the minor and readily repairable conditions we have detailed. The trouble with the one ferrule, en route to Salonica, we find in the language of one of libelants' own experts to be an "isolated case" without significance.

The log does record that on sailing from Port Said the density of the water in both boilers was $\frac{1}{32}$nd and that it remained at that level down to arrival at Aden. It does appear too that the vessel at least at times during the voyage, if not always, used salf water for make-up feed to the boilers. We agreed with libelants' expert John Briggs that the fact that there was no increase in the density of the water in the condenser was an indication that the condenser was tight on this leg of the voyage.

At this point, we must recall that between December 14, 1940 and January 18, 1941 the vessel was at Aden for tail-shaft repairs, and that while these repairs were being made part of the cargo was discharged onto lighters and the vessel was tipped. During this time the engines and the condenser were idle; the Chief Engineer's Log Book shows no entries after December 17, 1940 until January 16, 1941, at which date the tail-shaft repairs had been made and the re-loading of the cargo had been completed. Apparently, during this time the fires had either been banked or out, but in any event, there was no regular circulation of water in the condenser and over the wooden ferrules, or any provision to keep them moist or to prevent them from drying out. This, we find to be the neglect and fault of the engine room personnel and it was followed by considerable damage to the ferrules.

The vessel sailed from Aden at 4:45 p. m. on January 17th, 1941; and at 8:00 p. m. a leak was discovered in the condenser. The density of the water in both boilers is recorded as being $\frac{3}{8}$ths of $\frac{1}{32}$nd at that time. The log states that despite all measures taken by the ship's engineers, the condenser leak continued from then until arrival at Durban on February 11th, 1941. The density of the boiler water increased slowly but steadily, and this occurred despite frequent blowing down of the boilers to reduce the density, which attained $2\frac{1}{2}$ thirty-seconds in the port boiler and $1\frac{3}{4}$ thirty-seconds in the starboard boiler. There is no doubt but that the condenser was then in urgent need of repairs and that it was leaking very badly and the Chief Engineer so notified the Master.

En route from Aden to Durban, the vessel arrived at Mombasa on January 30, 1941 and there the log shows that the "leaking condenser" was inspected, that two tubes were plugged and that both boilers were blown because of the density of the water. All this was done without lasting result.

We have heretofore detailed the repairs made to the condenser at Durban, which consumed about 12 days.

 The neglect and fault in properly caring for the ferrules of the condenser while the vessel was at Aden constitutes an error in management for

the consequences of which the carrier is exonerated from liability under Section 1304, Subd. (2) (a) of COGSA of 1936 (46 U.S.C.A.). That section provides:

"(2) Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from—

"(a) Act, neglect, or default of the master, mariner, pilot, or the servants of the carrier in the navigation or in the management of the ship."

The exemption is unconditional. United States v. Farr Sugar Corp., 2 Cir., 191 F.2d 370, 376; Isbrandtsen Co. v. Federal Ins. Co., D.C., 113 F.Supp. 357, affirmed, 2 Cir., 205 F.2d 679; certiorari denied 346 U.S. 866, 74 S.Ct. 106, 98 L.Ed. 377. Negligence or error by the crew in the management of the ship's engines or equipment

"always operates to exonerate the carrier unless due diligence (to make the vessel seaworthy) has not been used in some respect *proximately causing* or contributing to the loss." Benedict on Admiralty, 6th Ed., Sec. 95, pages 291–2; The S.S. San Guiseppe, 1941 A.M.C. 315, 319; affirmed 4 Cir., 122 F.2d 579.

We find no substance to libelants' next specification of unseaworthiness which concerned the quality of the bunkers and the claim that the coal used on the voyage was of poor quality, that it burned with great difficulty, produced little steam and thereby occasioned delay in the voyage, and was causally related to the heating damage and to the fire in the cargo on board.

As to the facts concerning the coal on the vessel there seems to be no factual issue.

It appears that on arrival at Spalato, the vessel was in need of bunkers as it had only 240 tons aboard. At Spalato, she took on board 400 tons of Yugoslavian coal and not of good quality. It burned with great difficulty, and there was difficulty making steam with it. The Chief Engineer complained to the Master about the coal; and subsequently, when he was relieved, told his successor and Nicholas Goulandris about it. The fact that the bunkers at that time consisted largely of Yugoslavian coal was known to Nicholas Goulandris, one of the respondents, when the vessel arrived at Piraeus on October 26, 1940.

No additional coal was laden at Piraeus. At Aden 606 tons were laden, also of poor quality. The quality of the vessel's bunkers held down her speed to such an extent that she could not keep up with her convoy. At Mombasa, the vessel bunkered with poor coal which gave trouble between there and Durban and at Durban she bunkered again with coal of poor quality. All of the poor quality bunkers cut down the vessel's speed, but to what extent we are not informed.

The libelants have not produced any evidence that the vessel could have purchased better quality of coal than was laden at Aden or elsewhere. There is evidence from which we find that after the commencement of World War II all coal in the Mediterranean was under the control of the British Admiralty; and after war between Greece and Italy broke out, certainly at Greek ports a cargo vessel had available to it only the coal allocated to it.

Nor are we satisfied that any delay occasioned by poor quality of coal in any way was causally connected with the heating or fire damage to the cargo.

We come then to libelants' final and empty specification of unseaworthiness, premised upon the claim that the vessel's officers were incompetent because they had not previously served on vessels which carried large quantities of tobacco to the United States.

All the officers were properly licensed and experienced seamen; this of itself establishes prima facie due diligence cf. The Buckleigh, 2 Cir., 31 F.2d 241, 242. But, independently of the licenses, it appears that the Master Polemis, in command of the vessel when it

was loaded, had had considerable tobacco cargo experience, and that the other officers were experienced in the handling of perishable cargoes and were not ignorant of the characteristics of a tobacco cargo.

We specifically find that at the beginning of the voyage from Izmir, Salonica, Cavalla, and Piraeus, due diligence was exercised to make the S.S. Ioannis P. Goulandris seaworthy, properly manned, equipped and supplied and to make the holds of the ship in which the goods were carried, fit and safe for their reception, carriage and preservation and that the vessel was in all respects seaworthy.

We then examine the libelants' contentions that the cargo losses resulted from negligent stowage and failure to give the cargo due care.

The cargoes in suit consisted of tobacco, olive oil and cheese; at this point we weigh only the evidence concerning the damage sustained by the tobacco cargo. Libelants have specifically alleged with respect to this cargo and in answer to interrogatories, that the stowage was without adequate ventilation and that there were insufficient ship's ventilation facilities for the tobacco stowed as it was.

The respondent owners have had prepared and there is in evidence a schematic diagram of holds Nos. 1 and 2. This diagram, drawn with the aid of the cargo surveyor who surveyed the vessel upon discharge, shows the relative place of stowage of various shipments of tobacco; those that outturned sound and those that outturned in damaged condition. The diagram also shows the percentage and number of bales damaged in each lot. We must be mindful that this diagram shows the locations of the cargo at the time of discharge and that before, at Barbados, much of the cargo had been discharged following the fire at sea. We have however found it of help and therefore received it in evidence.

The tobacco which was damaged had been stowed in Nos. 1, 2 and 3 holds. In No. 1 hold there was stowed 18,673 bales of the tobacco consigned to R. J. Reynolds Tobacco Co. There was at the bottom of the hold 3,600 bales stowed at Izmir; above that 8,837 bales shipped at Cavalla, and above that three lots respectively of 2,555 bales, 2,280 bales and 1,401 bales all shipped at Salonica. Libelants make claim for damage to only three of the shipments in No. 2 hold; they are the shipment of 1,956 bales made by Papastratos Freres at Piraeus, stowed at the top of the middle section (fore and aft) of the hold; the shipment of 600 bales made by A. Camaras & Co. at Salonica, stowed at the bottom of the after end of the hold; and the shipment of 3,524 bales (part of 3,684 bales, 160 of which were in No. 3 'tweendeck) made by Papastratos Freres at Salonica, stowed at the top of the after end of the hold. The damage in Nos. 1 and 2 consisted of heating; fire resulting in tobacco cargo damage occurred only in No. 3 hold. The fire losses require separate consideration, and this we shall do later.

The bills of lading set out the apparent good order and condition of libelants' goods at time of shipment (46 U.S.C.A. § 1303(3) (c). All of them read:

"Received * * * in apparent good order and condition unless otherwise indicated in this bill of lading * * *"

and none of them contain any notation indicating that at time of receipt by the carriers, the respective shipments were in other than apparent good order and condition. The evidence shows that all of the tobacco stowed on the vessel was outwardly in apparent good order as was all the general cargo. There is no dispute that libelants' cargo was in damaged condition when discharged.

The Carriage of Goods by Sea Act (46 U.S.C.A. § 1303(4) provides:

"Such a bill of lading shall be prima facie evidence of the receipt

by the carrier of the goods as therein described \* \* \*"

But, as Judge Rifkind observed in American Tobacco Co. v. The Katingo Hadjipatera, D.C., 81 F.Supp. 438, 446, apparent good order and condition "does not refer to such unobservable conditions as are encompassed by the phrase 'inherent vice'." Hecht, Lewis & Kahn, Inc. v. Buchanan, 2 Cir., 1956, 236 F.2d 627. Here, the respondents have urged that the tobacco was damaged by heating of internal origin and was not in fit condition for the voyage actually made via the Suez and that it had an excess moisture—an inherent vice which was a causal factor of fermentation and self heating. Proctors have briefed and argued the question whether the burden of proof is upon the libelants, as the shippers of the cargo to ultimately establish that the cargo was free of this inherent vice, or whether it is with the respondents as carriers to ultimately establish inherent vice. Judge Rifkind was presented with this same problem in The Katingo, supra (81 F.Supp. at pages 446, 447). He relied upon The Niel Maersk, 2 Cir., 1937, 91 F.2d 932; certiorari denied 302 U.S. 753, 58 S.Ct. 281, 82 L.Ed. 582, and reading it to hold

> "that the shipper must affirmatively establish the good condition at time of shipment of goods damaged by heating, where the carrier claimed the cause to have been inherent vice." (The Katingo, supra, 81 F.Supp. at page 446)

Judge Rifkind concluded that this holding was to be applied.

■ We have concluded that the ultimate burden of establishing that the tobacco cargo was free of inherent vice is upon the libelants if the tobacco is shown to have been damaged by heating of internal origin. The respondents have the burden of proving causal connection between an inherent vice and the damage (Section 4(2) (m) of the Act, 46 U.S.C.A. § 1304(2) (m). Thus, if the respondents prove that the heating damage to the tobacco was of internal origin, libelants have the burden of establishing the sound condition of the cargo when delivered to the vessel, i. e. that it was free of "inherent defect, quality, or vice". If libelants fail to sustain the burden, the respondents also have the burden of bringing themselves within the exemption of Section 4(2) (m) of the Act, and of establishing that the loss or damage sustained by the cargo arose or resulted from an "inherent defect, quality, or vice".

■ We have found that the voyage from Piraeus via Suez was a new voyage and a new undertaking. Notwithstanding the increase of freightage paid to the Owners, it was made on the orders of and at the direction of the Greek government, the sovereign and the government under whose flag the vessel sailed. Refusal to undertake this voyage (three times longer in distance than the expected voyage via Gibraltar) at time of war probably would have resulted in requisition or confiscation of the vessel and personal charges of disloyalty against the Owners. However, the intervention and action of the Greek government did not relieve the Owners or the vessel of all responsibility to the cargo aboard. Due and reasonable care of the cargo was still required of the respondents as carriers for hire, but the quantum of that care is to be measured by the circumstances under which the voyage was ordered and made. The Owners were in no position to refuse to sail as directed; the voyage was without opportunity to prepare for the longer tropical passage; the vessel sailed by order of the Greek government, equipped, manned and stowed as she was. There was neither time nor peacetime facilities for overhaul or restowage of cargo. The Master was under instructions to follow the order of the British Admiralty in convoy and had no control over the ports for bunkers or repairs. It is against these circumstances and conditions, not of the Owner's making or choice, that the care given the cargo is to be weighed.

We find from the evidence that the heating damage to the tobacco cargo in holds Nos. 1 and 2 arose and had origin internally and within the bales; this being so the libelant had the burden of establishing that it was in fit internal condition for shipment. Moisture content in tobacco is a causal factor of fermentation and self-heating; excessive moisture within the bales is an inherent vice and tobacco shipped with too much moisture will ferment and self-heat on a long voyage through tropical climates. It appears that if tobacco is prepared properly with a moisture content less than 14% it will withstand a voyage without self-heating damage.

Libelants do not dispute that the tobacco cargo contained some moisture. The bulk of the tobacco shipments was harvested in the fall of 1939 in Greece and Turkey; it went through some fermentation in the summer of 1940 but still contained some residue of fermentable material. The growing season for the 1939 crop had been very rainy and too much rain gives to the tobacco an increased moisture content and it requires greater care and sorting before being put up into bales. It was of prime importance to keep the moisture content down to a safe limit before shipping. The tobacco had been prepared, baled and loaded in contemplation of its being carried on a short voyage to the United States via Gibraltar. The actual moisture content is of greater importance because of the longer voyage through tropical waters via the Suez. The voyage made to Norfolk lasted 144 days; certainly this was an unprecedented voyage for bailed leaf tobacco and one not anticipated or expected when the tobacco was shipped and loaded. The voyage to Norfolk via Gibraltar would have been completed ordinarily in 30 to 35 days.

The evidence is convincing that the damage done to the bales in holds Nos. 1 and 2 by heating was due to the internal nature of these bales and not due to external causes. This heating damage would have occurred in these bales irrespective of any amount of ventilation.

Although it was the opinion of libelants' own expert that No. 3 hold had normal and adequate ventilation, it was in this very hold that the tobacco heated and ignited. Likewise, it is libelants' contention that the ventilation in No. 2 hold was inadequate, yet here there was no fire.

Some of the bales stowed in the top tiers of No. 2 hold did not stand up under the voyage, but some stowed in the bottom center of the hold outturned sound. We find from this and other similar differences in the outturned condition of bales stowed in the same hold that the damaged bales started the voyage "under some handicap" due to their internal condition on shipment (Cf. The Maine, 1927 AMC 443, 446).

We find that there was no uniformity of moisture content in the bales; that each shipment, and each bale of every shipment, and each leaf of bale varied. This is the only logical inference to be drawn from the nature and extent of the cargo damage sustained and from the different sources and handling of the bales. Cf. General Foods Corp. v. The Troubador, D.C.N.Y.1951, 98 F.Supp. 207. There is an absence of convincing proof of the moisture content of any of the damaged tobacco at the time of loading. Libelants have failed to establish that the tobacco cargo was free of inherent defect, quality or vice. This claim for heating damage to the tobacco cargo must fall because it is clear this damage was due to an internal condition and of internal origin and not to the neglect or fault of respondents or of the vessel. At Aden the discharged bales from No. 3 hold were dry when reloaded and the bales in the forward half of No. 3 lower hold, which had not been discharged, were found upon inspection to be in good condition. There was no reason to believe that they would self-heat during the remainder of the voyage. When the new voyage was ordered by the Greek government, representatives of some of the libelants were present yet none spoke of the advisability of restow-

age of the tobacco, much less than of necessity to restow.

The heating damage was inevitable on the long voyage because of the internal condition of the bales. We find that the damage was not due to any fault or negligence in either stowage or ventilation. "The block stowage" system employed was proper and in accord with usual practice; it was customary, adequate, and normal. The ventilation was ample and adequate to prevent sweat damages to the cargo. There is no evidence of any such damage to the cargo. As respondents state the purpose of ventilation is not to dehydrate cargo shipped with too much moisture and dry damp cargo. Libelants, themselves, point out that the tobacco destined for use in the manufacture of cigarettes, must contain some moisture for bone dry tobacco is too brittle to handle and in processing results in costly wastage of worthless scrap. The vice here was not that the tobacco contained moisture but that the moisture was so excessive as to make it dangerous for carriage. Ventilation is not intended to cure this vice, nor could it have removed the vice inherent in the bales. We do not find the use of rice ventilators or of windsails to have been common or accepted practice. Rice ventilators were found to have chafed and distorted the shape of the bales; and at very best they do not serve any substantial purpose because they may protect half a dozen bales but not the body of the stow. Libelants' own expert never used windsails to ventilate tobacco. Even when a windsail was erected over No. 3 hold at Barbados it proved of no avail because the tobacco heated again. The contention that athwartship channels of empty space should have been left in the stow is not supported by our view of the evidence.

The damage to tobacco that fermented and self-heated was due solely to the condition of the tobacco when shipped, without any fault of the vessel owners, and the fact that the tobacco was of a type which was not capable of standing up during transportation on a voyage via Suez and the Cape of Good Hope.

We have found that all of the tobacco cargo aboard was properly stowed and cared for during the voyage on a seaworthy vessel and that the heating damage to the tobacco cargo in No. 1 and 2 was due to inherent vice. This should dispose of the claims for cargo stowed in No. 3 hold which was damaged by fire; none the less we will examine these claims.

The only cargo compartments of the vessel in which fire occurred were the No. 3 hold, and the No. 3 'tweendeck above it. In those compartments, according to the stowage plan, there were stowed the following shipments:

4,714 bales of tobacco shipped by Yerli Urunler T.A.S. at Izmir.

291 bales of tobacco shipped by Yerli Urunler T.A.S. at Izmir.

4,159 bales of tobacco shipped by The American Tobacco Company of the Orient at Izmir.

138 bales of tobacco shipped by The American Tobacco Company of the Orient at Izmir.

2,928 bales of tobacco, part of a lot of 5,000 bales, shipped by Gary Tobacco Company at Izmir.

160 bales, part of a lot of 3,684 bales of tobacco, shipped by Papastratos Freres at Salonica.

1,110 bales of tobacco shipped by Pialoglou Fils at Cavalla.

Of the 9,302 bales of tobacco stowed in No. 3 lower hold, (including 100 bales of the same parcels stowed in No. 3 'tweendeck) 6,450 were damaged only by water and smoke. Of the remainder, 2,122 were worthless as a result of heating; 657 were damaged by fire and the remaining 73 were damaged by water. All of the damage to the cargo in No. 3 'tweendeck resulted from the fire, or from water used to extinguish it.

It is only to those shipments that respondents' defenses under the Fire Statute and the fire exemption of the Carriage of Goods by Sea Act relate.

The Fire Statute (46 U.S.C.A. § 182) provides:

"No owner of any vessel shall be liable to answer for or make good to any person any loss or damage, which may happen to any merchandise whatsoever, which shall be shipped * * * on board any such vessel, by reason or by means of any fire happening to or on board the vessel, unless such fire is caused by the design or neglect of such owner."

and the Carriage of Goods by Sea Act (46 U.S.C.A. § 1304(2)) provides:

"Neither the carrier nor the ship shall be responsible for loss or damage arising or resulting from— * * * (b) Fire, unless caused by the actual fault or privity of the carrier; * * * "

■■■ Libelants concede that there was a fire in the vessel's No. 3 cargo compartments. The burden rests on them to establish that the fire resulted from the personal negligence of respondents. The libelants do not contend that the fire was caused by the design of the respondents.

There is no evidence that the fire resulted from an external source of ignition. Its cause, therefore, must be sought in the conditions which existed in the No. 3 compartments during the voyage.

The seat of the fire was located in No. 3 hold, on the starboard side, about 12′ aft of the forward bulkhead and about 3′ above the tank tops, in the area where the shaft tunnel joins the tunnel recess. The tobacco there in stow was part of the 4614 bale shipment made by Yerli Urunler, S.A. at Izmir, which had not been discharged at Aden.

Here, as in The Katingo, supra, the libelants contend that the bales touched by fire in the No. 3 hold were worthless before the fire broke out. This most likely was the fact for the heating of the tobacco in No. 3 lower hold prior to the fire resulted from the same causes as the heating in Nos. 1 and 2 lower holds.

■■■ However, this heating was due to inherent vice in the tobacco and not to fault of the respondents. Such spontaneous heat damage prior to the actual fire is all part and parcel of the one continuous and uninterrupted process (cf. Great Atlantic & Pacific Tea Co. v. Lloyd Brasileiro (The Pocone), 2 Cir., 159 F.2d 661) and is within the scope of the Fire Statute, once actual fire exists. We agreed with the conclusion of Judge Rifkind in The Katingo, when he wrote:

"It is urged that because some damage occurred by heating before the fire broke out, then, if the ship cannot prove what damage was solely caused by fire, she is liable for all damage. This argument would nullify the Fire Statute in many, if not all, cases of spontaneous combustion —an absurd result; cf. Consumers Import Co. v. Kawasaki Kisen Kabushiki Kaisha (The Venice Maru), 2 Cir., 1943, 133 F.2d 781, affirmed 1943, 320 U.S. 249, 64 S.Ct. 15, 88 L.Ed. 30, where the same argument could have been made on the facts."

To restrict the scope of the Fire Statute in the manner suggested by libelants, would be nothing short of "straw clutching".

"We must not clutch at such straws to find liability, or to construe the Fire Statute grudgingly." The Venice Maru, supra [133 F.2d 785].

Indeed, were libelants' contention legally sound, in view of the doctrine of The Vallescura, 293 U.S. 296, 55 S.Ct. 194, 79 L.Ed. 376, the Fire Statute would be judicially repealed as to all fires caused by spontaneous combustion.

The damage to the tobacco by fire, heat, smoke and water (other than that to the self-heated tobacco) was directly caused by the fermentation and self-heating of the tobacco manipulated and prepared by Urunler and water used to extinguish the fire, and was not due to any fault of the vessel owners.

■■■ We find that the libelants have failed to prove any design, personal

neglect or actual fault of the owners in connection with the damage to the cargo resulting from the fire and the means used to extinguish it. None of the vessel owners had privity or knowledge of any fault or negligence which occasioned the damage, including the fire, sustained by the cargo.

The evidence shows that of the respondent owners, only Nicholas Goulandris was on board the vessel at any of the pertinent times. He came aboard on October 26, 1940 when the vessel arrived at Piraeus to ascertain whether any engine repairs were required. It was a Saturday, two days before war was declared between Italy and Greece. He asked to have the log books sent to him at his office; he intended to inspect the engine room. It was, as we have found, on Monday, October 28, 1940 that the vessel was requisitioned. The inspection was never made and the log did not reach him until 10 days after the vessel had sailed. He did not see the stowage plan or the tobacco cargo in No. 3 lower hold. The stowage plan was prepared by the Chief Officer at the loading ports; and there is no evidence that Nicholas Goulandris, who it appears was a marine engineer, was concerned with anything but the possibility of needed repairs to the engines.

We find no evidence to sustain libelant's contention that Basil Goulandris had directed the tobacco stowage. He knew of the contracts of carriage made by "Hellas" but there is no proof that he saw a copy of the stowage plans before the vessel sailed from Piraeus or that he had been on board the vessel at Piraeus or that he knew prior to November 10, 1940 how or in what manner the vessel was stowed. As to the employee of the respondent owners, Firios of whom we have written before, there is no evidence that he was in any way, shape or manner the "alter ego" of the vessel's owners. There is no evidence to support a finding that the fire was caused by the neglect of the respondent owners.

There still remains for consideration the claims for damage to the shipment of cheese and for the short delivery of and damage to the shipment of olive oil.

The Lekas & Drivas shipment of cheese was laden at Salonica. It consisted of 308 cases and 7 barrels. The bill of lading is clean. 241 of the cases were stowed in the poop. The remaining 67 cases and the 7 barrels were stowed in the after part of No. 4 lower hold (Owners' Ex. 20, pp. 499–500; A.S. 147). All were discharged at New York from the poop with the packages heavily stained by butter fats, etc., from the cheese, and in addition with the rinds worm-eaten.

The poop was above the main deck of the vessel, aft of No. 4 hatch. It was about 10 feet high. Its exact length and breadth do not appear, but it had a bale capacity of 6,222 cubic feet. It had no permanent ventilators. The hatch opening, 12 feet by 14 feet, was the only means of affording it any ventilation. It was filled with all the cheese the space would take, from forward to aft and from side to side. The deck was steel, as was the overhead, and neither was sheathed.

The sides, ends and top of the poop space were exposed to the sun and heat. Cheese of the type shipped requires refrigeration. We find that the poop was not a fit and proper place for carriage of the cheese from Greece to New York via the Mediterranean-Gibraltar route, because of the poop's exposure to the heat of the sun on all sides; and because the compartment had no ventilation.

The cheese, according to the general average survey, sustained heavy damage.

We find that respondents have failed to establish that they gave the cheese cargo due care and are therefore liable for the damage to it.

We have noted that the claims of short delivery and of damage to the olive oil shipments were dismissed as to the "Greek Line", but remain as to the respondents Goulandris.

The shipments of olive oil (850 drums) were laden at Izmir, and stowed at the bottom of No. 2 lower hold. The bills of lading are clean. At New York, 17 drums of the Cory shipment and 5 of the Pompeian shipment were found dented, cut and leaking, with loss of part of contents; and one drum of the Pompeian shipment was short delivered.

The drums in which the olive oil was were of steel and had previously been used for shipments of gasoline. They were not new but were nevertheless sound and tight and apparently were of the usual type of drum employed in the trade when the shipments were made. We find that the drums were suitable for the shipments and were in good and sound condition. On discharge, some of them were dented, started and cut and had lost part of their contents. We do not accept respondents' explanation that this damage and leakage was due either to the condition of the drums or to the "ordinary working and pressure of cargo." Respondents have failed to offer an explanation for either the short delivery or the damage to and loss of the olive oil. Respondents have failed to establish due care of this cargo and are liable for the damage and loss it sustained.

At this point it is opportune to refer to the claim of the respondents Owners to the benefit of the right to limit their liability to the value of their interest in the vessel and pending freight (46 U.S.C.A. § 183). They have asserted this right in their answers to the libels and in a petition which they have filed (A 123–391). Since we have found the vessel seaworthy when she broke ground, and have exonerated these respondents for the fire damage, it seems that the question raised by the answers and the petition have become academic. In the revision of the statement of general average pleaded in the cross-libels, the value of the vessel on arrival at New York is stated at $356,004.38 and the net freight to be $298,698.20, or a total of $654,702.58 (the lowest limit to liability in any event).

Libelants urge that with respect to four shipments for which bills of lading were issued personally signed by Leonidas Goulandris (acting on behalf of himself and his two brothers—co-owners) there can be no limitation of liability for these were personal contracts of carriage. Leonidas Goulandris was the owner of a 30% interest in the vessel; the four bills of lading signed by him covered the following shipments:

| | | | | | |
|---|---|---|---|---|---|
| 8,837 | bales | from | Cavalla, | (R. J. Reynolds Tobacco Co.) | |
| 1,110 | " | " | " | (Pialoglou Fils) (Bank of | Greece) |
| 3,684 | " | " | Salonica | (Papastratos Freres) (Bank of | Greece) |
| 1,956 | " | " | Piraeus | " " " | |

This contention of the libelants is premised upon the theory that a bill of lading is a "personal contract" and that there can be no limitation of liability with respect to personal contracts. Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770. However, we hold that bills of lading are merely "ship's documents," issued to a shipper upon receipt of his goods and stating the terms of the contract of carriage made by the ship. The "personal contract" doctrine applicable to limitation has never been applied save to private contracts such as a charter party. Gilmore and Black in The Law of Admiralty treat of this at pp. 760–7, as follows:

"Bills of lading are not personal contracts—with the important result

that the shipowner may limit against cargo claims. * * *

"A charter party is the clearest example of what is, under current case law, held to be a 'personal contract'. Of the five Supreme Court cases which have involved the 'personal contract' doctrine, one (the Earle & Stoddart v. Ellerman's Wilson Line, 287 U.S. 420, 53 S.Ct. 200, 77 L.Ed. 403 case) refused to apply the doctrine to bills of lading; the other four all arose under charter parties, which were held 'personal' and the owner denied limitation. Indeed Justice Brandeis, in his opinion in Earle & Stoddart remarked that 'the rule * * * has been applied by this court only to private charter parties executed by the owner', which gives some ground for arguing that, in the Supreme Court's opinion, the doctrine covers charter parties and nothing else."

Even under the "personal contract" view of these bills of lading, respondents would be entitled to limit their liability since we have found that the vessel was seaworthy when she started out on the voyage. There was, therefore, no breach of a personal nature. The Soerstad, D.C., 257 F. 130; Cullen Fuel Co. v. W. E. Hedger Co., 1933, 290 U.S. 82, 54 S.Ct. 10, 78 L.Ed. 189; cf. In re Wood's Petition, 2 Cir., 1956, 230 F.2d 197.

We hold that this defense to the petition for limitation is without substance.

Finally, we come to the cross-libels filed by the three brothers Goulandris, each of whom was the owner of a 30% interest in the ship. These cross-libels are filed on their own behalf and on behalf of "all other parties interested in said vessel."

The issues under the cross-libels do not involve "Greek Line" in any way. They exist only between the brothers Goulandris, owners of the vessel, as cross-libelants, and the following cross-respondent cargo owners:

R. J. Reynolds Tobacco Company
Liggett & Myers Tobacco Company
Bank of Greece
Pompeian Olive Oil Corporation
Lekas & Drivas, Inc., and
Victor Cory Company.

The American Tobacco Company, a creditor on balance in the statement of general average, was not named a cross-respondent.

In The Jason, 225 U.S. 32, 32 S.Ct. 560, 56 L.Ed. 969, the Supreme Court held that by contract the vessel owner might become entitled to contribution in general average when he had exercised due diligence to make the vessel in all respects seaworthy and the event giving rise to the general average sacrifice was one of the causes enumerated in Sec. 3 of the Harter Act (46 U.S.C.A. § 192) even if the Owner's negligence contributed to the loss. The bill of lading clause accomplishing this came to be known as the "Jason" clause. A subsequent modification known as the "New Jason" clause, provides in substance that the vessel owner is entitled to general average contribution in any case in which he is not liable for cargo damage under COGSA (Sec. 5, 46 U.S.C.A. § 1305) and even where unseaworthiness did not contribute to loss. Isbrandtsen Co. v. Federal Ins. Co., D.C., 113 F.Supp. 357; Id., 2 Cir., 1953, 205 F.2d 679. The bills of lading here involved contain the "New Jason" clause. It is set out as Clause "10" of the bills of lading.

The cargo owners respondents concede that the fire on the vessel created a situation of imminent peril to the entire venture and that the damage caused by the water used to extinguish it was a sacrifice and that part of their cargo was saved. We have found that the vessel owners exercised due diligence to make the vessel seaworthy and that the fire did not result from the personal negligence of the vessel owners. But, the cross-respondents contend that these cross-libels must be dismissed because these vessel owners have sustained no damage.

The cross-libels do not allege that the sums owed by the cargo owners in general average are due to them—the vessel owners; and that the relief prayed for is that these cargo owners "may be held liable for their respective contributions in general average."

There was an average adjuster selected and a General Average Adjustment Statement made of the sums due from the cargo interests. Whether this statement correctly sets forth the disbursements and expenses incurred is to be later determined. However, we find that all of the cargo owners except American Tobacco Company benefited from the sacrifice made and the expenses incurred. Here, none of the consignees made payment to the adjuster of the amount estimated to be its contribution; the failure to make such payment before delivery of cargo did not operate to make the vessel owners liable (cf. Det Forende Dampskibs Selskab v. Insurance Co. of North America, 2 Cir., 28 F.2d 449, affirmed 2 Cir., 31 F.2d 658) because they elected to and did post a general average bond for the payment of their contribution.

▮ We adopt as correct the statement of Chief Judge Clancy in St. Paul Fire & Marine Insurance Co. v. The Motomar, 1953 A.M.C. 175, affirmed 2 Cir., 211 F.2d 690, that:

"It is the duty of the shipowner to 'cause the adjustment of the general average' and he 'in case of default is liable for the loss arising therefrom.' "

▮ The cross-libelants—as vessel owners—have the right and the duty to file these cross-libels to enforce collection from the cargo interests of their contribution of their indebtedness to the general average fund. This is the obligation of the cross-libelants even though on balance they may be debtors in general average.

Let an interlocutory decree be settled and submitted in accordance herewith.